[946 NYS2d 27]

Arnold Melman, M.D., Appellant, v Montefiore Medical Center, Respondent.

First Department, May 29, 2012

**APPEARANCES OF COUNSEL**

*Schwartz & Perry LLP*, New York City (*Murray Schwartz, Davida S. Perry* and *Brian Heller* of counsel), for appellant.

*Littler Mendelson, P.C.*, New York City (*Jean L. Schmidt* of counsel), for respondent.

**OPINION OF THE COURT**

FRIEDMAN, J.P.

Plaintiff Arnold Melman, M.D., was hired as chairman of defendant Montefiore Medical Center's urology department in

1988, when he was 47 years old. In 2007, when he was 66, he commenced this action against Montefiore, asserting causes of action for age discrimination and retaliation in violation of the New York City Human Rights Law (Administrative Code of City of NY § 8-107 [1] [a]; [7]).[1] Although plaintiff remains in his position as chairman of the urology department, he alleges that Montefiore has discriminated against him on the basis of his age, and has retaliated against him for protesting this discrimination, by compensating him at a rate unreasonably low for a physician of his professional attainments, limiting his control over his department, and otherwise treating him with perceived disrespect. He now appeals from Supreme Court's order granting Montefiore's post-discovery motion for summary judgment (*Melman v Montefiore Med. Ctr.*, 36 Misc 3d 1216[A], 2010 NY Slip Op 52453[U] [2010]). For the reasons discussed below, we affirm.

In his opening brief, plaintiff states that his claims "should be analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." The *McDonnell Douglas* framework has been adopted for use in discrimination actions brought under the respective Human Rights Laws of the State and City of New York (*see Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 305 [2004], citing *Ferrante v American Lung Assn.*, 90 NY2d 623, 629-630 [1997]). The New York City Human Rights Law (NYCHRL) was amended by the Local Civil Rights Restoration Act of 2005 (LCRRA) (Local Law No. 85 [2005] of City of NY) to clarify, among other things, that it should be construed, regardless of the construction given to comparable federal and state statutes, "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (*Albunio v City of New York*, 16 NY3d 472, 477-478 [2011]). However, neither the LCRRA nor the City Council report thereon (Rep of Governmental Affairs Div, Comm on Gen Welfare, 2005 NY City Legis Ann, at 536-539) sets forth a new framework for consideration of the sufficiency of proof of

---

1. In pertinent part, Administrative Code § 8-107 (1) (a) makes it unlawful for an employer "because of the actual or perceived age . . . of any person, . . . to discriminate against such person in compensation or in terms, conditions or privileges of employment." In pertinent part, Administrative Code § 8-107 (7) makes it unlawful "for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has . . . opposed any practice forbidden under this chapter." We note that plaintiff does not assert any claim under the New York State Human Rights Law (Executive Law § 296).

claims under the NYCHRL or indicates that the *McDonnell Douglas* framework is to be discarded.

■ In a recent decision that affirmed summary judgment dismissing a complaint, this Court held that an action brought under the NYCHRL must, on a motion for summary judgment, be analyzed both under the *McDonnell Douglas* framework and the somewhat different "mixed-motive" framework recognized in certain federal cases (*see Bennett v Health Mgt. Sys., Inc.*, 92 AD3d 29, 45 [2011] [summary judgment dismissing a claim under the NYCHRL should be granted only if "no jury could find defendant liable under any of the evidentiary routes—*McDonnell Douglas*, mixed motive, 'direct' evidence, or some combination thereof"]). Under *Bennett*, it is proper to grant summary judgment dismissing a claim under the NYCHRL only if the defendant demonstrates that it is entitled to summary judgment under both of these frameworks. Although plaintiff himself has not suggested that we analyze this case under a mixed-motive framework, in adherence to the holding of *Bennett* and to the aforementioned intent of the LCRRA that the NYCHRL be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (*Albunio*, 16 NY3d at 477-478), we will subject this action both to a *McDonnell Douglas* analysis and to a mixed-motive analysis. As described below, we believe that Montefiore—like the defendant in *Bennett*—is entitled to summary judgment under either analytic framework.

We turn first to an analysis of plaintiff's discrimination claim under the *McDonnell Douglas* framework, as the parties have presented the case to us. Under the *McDonnell Douglas* framework as applied in New York, a plaintiff alleging employment discrimination in violation of the NYCHRL

> "has the initial burden to establish a prima facie case of discrimination. To meet this burden, plaintiff must show that (1) [he] is a member of a protected class; (2) [he] was qualified to hold the position; (3) [he] was terminated from employment or suffered another adverse employment action; and (4) the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination. The burden then shifts to the employer to rebut the presumption of discrimination by clearly setting forth, through the introduction of admissible evidence, legitimate, independent, and nondiscrimi-

natory reasons to support its employment decision. In order to nevertheless succeed on [his] claim, the plaintiff must prove that the legitimate reasons proffered by the defendant were merely a pretext for discrimination by demonstrating both that the stated reasons were false and that discrimination was the real reason" (*Forrest*, 3 NY3d at 305 [footnote, citations and internal quotation marks omitted]).

"Moreover, the burden of persuasion of the ultimate issue of discrimination always remains with the plaintiff[ ]" (*Stephenson v Hotel Empls. & Rest. Empls. Union Local 100 of AFL-CIO*, 6 NY3d 265, 271 [2006]).

▊ In his brief, plaintiff summarizes his complaint against Montefiore as follows: "Melman was paid far less than his position and accomplishments warranted, while younger physicians were treated more favorably." In this regard, plaintiff (whose total compensation for 2008 was close to half a million dollars) complains that Montefiore denied his requests for raises, gave him inadequate raises, and awarded him insufficient bonuses. Plaintiff points out that Dr. Spencer Foreman, Montefiore's former president and CEO, admitted at his deposition that he told plaintiff in 2006 that "his compensation at Montefiore was below the level of others in comparable positions elsewhere." In support of the contention that "younger physicians were treated more favorably," plaintiff identifies one of his subordinates in the urology department (referred to hereinafter as RG), a physician 25 years younger than himself, who (at the very end of the period documented in the record) received total annual compensation exceeding plaintiff's.[2] Plaintiff testified that, on one occasion, Montefiore acceded to RG's demand for an increase in compensation around the same time that the

---

**2.** The general rule is that an employee bringing a claim for unlawful discrimination in compensation must show that "he is a member of a protected class and . . . was paid less than similarly situated nonmembers of the class" (*Shah v Wilco Sys., Inc.*, 27 AD3d 169, 176 [2005], *lv dismissed in part, denied in part* 7 NY3d 859 [2006]). For present purposes, we will assume that plaintiff may establish a prima facie case of age discrimination in compensation by showing that he was paid less than a substantially younger subordinate. Oddly, although the alleged inadequacy of his compensation is the heart of plaintiff's claim, the dissent barely discusses the evidence concerning the compensation of plaintiff, his subordinates, and other Montefiore physicians. By essentially ignoring plaintiff's assertions that Montefiore discriminated against him in terms of compensation, and accusing us of placing "undue emphasis on the compensation aspect" of the claim, the dissent appears to concede that the compensation aspect of the claim is without substance.

hospital denied plaintiff's request for a raise. Plaintiff further contends that a pattern of discrimination against older physicians can be discerned from a number of instances in which Montefiore "forced out" older departmental chairmen and replaced them with significantly younger physicians. Bearing in mind that, as previously noted, the LCRRA directs us to construe the NYCHRL "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (*Albunio*, 16 NY3d at 477-478; *see* Administrative Code § 8-130), we assume that these circumstances surrounding the challenged adverse actions "giv[e] rise to an inference of discrimination" (*Forrest*, 3 NY3d at 305) so as to enable plaintiff to carry his "de minimis burden of showing a prima facie case of age discrimination" (*Exxon Shipping Co. v New York State Div. of Human Rights*, 303 AD2d 241, 241 [2003], *lv denied* 100 NY2d 505 [2003], citing *Schwaller v Squire Sanders & Dempsey*, 249 AD2d 195, 196 [1998]).

■ Assuming, as we do, that plaintiff has established "the minimal prima facie case" (*Broome v Keener*, 236 AD2d 498, 499 [1997]), the burden shifts to Montefiore to come forward with admissible evidence that it had "legitimate, independent, and nondiscriminatory reasons" (*Forrest*, 3 NY3d at 305) for taking the actions adverse to plaintiff for which he sues. As the dissent and plaintiff concede, Montefiore has sustained this burden.

Turning first to the issue of RG's compensation, it is undisputed that this physician's demands for increased compensation were granted because he was threatening to leave Montefiore if he were not given a raise. Indeed, plaintiff testified that he personally, out of a desire "to protect my faculty that I had hired," conveyed RG's salary demand to Foreman, warning that RG was "going to leave if we don't give him more money."[3] The record shows that there was reason to believe that RG was not making an idle threat. Susan Green-Lorenzen, who was Montefiore's clinical vice-president with operational responsibility for the urology department during the relevant period, states in her affidavit that RG is "the only surgeon in our employ who possesses the unique skill set to perform robotic prostate surgery and train future surgeons on robotic urology surgery."[4] Green-Lorenzen further notes that, when RG's base salary was

---

3. By contrast, plaintiff admitted that he never threatened to leave if Montefiore refused to grant him a requested raise.

4. By his own admission, plaintiff does not perform robotic surgery.

increased to $400,000 in 2006, "other robotic surgeons in the local area were compensated at a rate exceeding $500,000." Montefiore was "well within its rights in considering the marketplace value of [RG's] skills when determining his salary" (*Kent v Papert Cos.*, 309 AD2d 234, 244 [2003]).

Moreover, plaintiff's total compensation exceeded RG's in each year from 2004 through 2007. The record shows that (1) it was not until 2007 that RG's total compensation rose to within $100,000 of plaintiff's and (2) it was only at the end of 2008, the last year documented in the record, that RG's total compensation first exceeded plaintiff's.[5] Aside from RG at the very end of the period for which we have evidence, plaintiff does not identify any subordinate of his (of any age) whose compensation exceeded his own. In fact, the record shows that plaintiff was paid more than each of his subordinates other than RG during the entire period from 2004 through 2008. During those five years, plaintiff's total annual compensation exceeded that of his highest-paid subordinate other than RG by an average of approximately $190,000.[6]

Montefiore also set forth, through Green-Lorenzen's affidavit, the charges, collections, Relative Value Units (RVUs) (a metric used by Medicare) and operating room (OR) cases generated for the hospital by plaintiff's and RG's respective practices from 2004 through 2008. Montefiore uses these indicators in determining a physician's compensation. In each category, plaintiff's numbers declined or stayed the same through this period, while RG's increased. For example, plaintiff's RVUs

---

5. The year-end compensation figures for plaintiff (AM) and RG for the years 2004 through 2008 are as follows:

| Year | AM Salary | AM Bonus | RG Salary | RG Bonus |
|------|-----------|----------|-----------|----------|
| 2004 | $352,578 | $125,000 | $211,285 | $60,000 |
| 2005 | $352,578 | $100,000 | $320,000 | $30,000 |
| 2006 | $363,156 | $100,000 | $320,000 | $40,000 |
| 2007 | $377,682 | $125,000 | $400,000 | $75,000 |
| 2008 | $377,682 | $100,000 | $450,000 | $75,000 |

6. We note that plaintiff's opening brief misleadingly states that Montefiore gave "greater compensation to younger *physicians* [plural] who report[ed] to Melman" (emphasis added). In fact, as pointed out in Montefiore's brief, uncontroverted evidence establishes that RG was the only one of plaintiff's subordinates who ever earned more than plaintiff did during the five-year period documented in the record. Commendably, the assertion that more than one of plaintiff's subordinates earned more than he did, although not expressly withdrawn, is not repeated in plaintiff's reply brief.

decreased by 34% during this five-year period but RG's RVUs increased by 34%; plaintiff's OR cases stayed essentially the same throughout the period but RG's OR cases increased by 40%. By 2008, RG's figure for each indicator was substantially higher than plaintiff's.[7]

Plaintiff also complains that, as Foreman told him in 2006, he was paid less than physicians in comparable positions at other institutions.[8] In this regard, he highlights his own achievements as a clinician, researcher and administrator, asserting that his compensation was unreasonably low for a physician with such an exemplary record. However, even if we assume the accuracy of plaintiff's description of his achievements—and ignore the failings set forth in Montefiore's submissions—he does not discuss how his achievements compare with the achievements of chairmen of other departments at Montefiore or with the achievements of chairmen of comparable departments at other institutions. For example, plaintiff makes much of his personal, nonexpert estimation that the urology department generated $228 million in revenue for Montefiore during his chairmanship from 1988 through 2008. Assuming that this estimate is accurate, it does not tell us whether the department was meeting expectations, over-performing, or under-performing. In this regard, Robert B. Conaty, Montefiore's executive vice-president for operations, states in his affidavit:

> "In determining Dr. Melman's compensation, I did not ignore the money that the Urology Department contributed to Montefiore. It was expected that the Department would contribute that much money. Other departments generated as much and most generated more. Thus the fact that the Department generated money did not offset or excuse the issues with Dr. Melman's performance."

As noted in the above remark, Montefiore was entitled, in setting plaintiff's compensation, to consider the deficiencies of his performance as a departmental chairman, as well as his achievements. A number of the perceived deficiencies in plaintiff's per-

7. Plaintiff's 2008 figures were: charges, $1,323,406; collections, $391,050; total RVUs, 8,592; OR cases, 136. RG's 2008 figures were: charges, $2,294,820; collections, $532,818; total RVUs, 15,013.05; OR cases, 250.

8. Although the point is not determinative, we note that plaintiff does not quantify the prevailing level of compensation for physicians in comparable positions, which is presumably the amount he believes he should have been paid.

formance that were considered in setting his compensation are set forth in a December 2005 internal memorandum directed to Conaty by Lynn Stansel, Esq., Montefiore's counsel for compliance. This memorandum, which was prepared long before plaintiff first complained of age discrimination, details, among other problems in the urology department, the following: (1) a complaint was filed with the State Division of Human Rights based on plaintiff's refusal to perform an elective operation on an HIV-positive patient; (2) Montefiore settled, for consideration of more than a half million dollars, a lawsuit by two former urology department physicians who alleged that plaintiff engaged in improper billing and then terminated them when they complained; (3) Montefiore had to repay $400,620 to HIP due to double-billing attributed to plaintiff's failure to oversee billing for a matter he had negotiated; (4) professional misconduct complaints against plaintiff were filed with the State Office of Professional Medical Conduct (OPMC), including one based on his alleged failure to diagnose cancer that was settled for several hundred thousand dollars and another alleging that he made inappropriate comments about a patient's penile deformity; and (5) deficiencies in plaintiff's medical record keeping resulted in Montefiore's making a substantial repayment to Medicare, OPMC's issuance of warnings to plaintiff in 2003 and 2005 directing him to amend his practices to comply with New York State law, and Montefiore's placing plaintiff on medical review for a number of years. The December 2005 memorandum estimates that Montefiore paid out, on behalf of the urology department or plaintiff himself, a total of $1.5 million in reimbursements, penalties and liabilities arising from the matters described therein.

In addition, Montefiore documents that, from 2004 to 2006, the urology department's residency program—of which plaintiff was director—was placed on probation by the Residency Review Committee (RRC) of the Accreditation Council for Graduate Medical Education. The RRC had earlier warned that deficiencies in the program required correction. Even when the program was taken off probation in 2006, the RRC noted that certain previously cited deficiencies had not been corrected.

Plaintiff attributes one problem with the urology residency program cited by the RRC—a deficiency of operative experience for residents—to Montefiore's failure to allow him to expand the department and, in particular, its refusal to permit him to hire a specialist in female urology. However, Montefiore explains,

without contradiction, that the hospital did not wish to duplicate the expertise in female urology it already had in its department of obstetrics and gynecology; that it was plaintiff's responsibility to make arrangements with other institutions and with the Montefiore OB/GYN department to afford Montefiore urology residents the requisite case experience; and that plaintiff was given authority to hire additional faculty but was not diligent in filling those positions.

As of the end of 2008, the urology department continued to have significant problems, as reflected in a memorandum by Conaty summarizing the performance review held for plaintiff on December 18, 2008. The memorandum acknowledges plaintiff's successes during the year, such as the recruitment of two specialists in pediatric urology. However, the memorandum notes that problems with recruitment remained: "[T]here are several critical positions which remain unfilled and recruitment efforts seemed to have stalled; recruitment efforts should have focused on building oncology and endoscopy services . . . [but plaintiff's] interest is in hiring a uro-gynecologist."[9] Other problems noted by the memorandum include complaints from residents ("poor teaching, lack of mentoring and feedback, as well as . . . limited breadth of operating experience and faculty involvement"); complaints from faculty ("The general sense is that [plaintiff] is absent from the Department . . . his physical presence in the Department is limited to 1-1½ days per week"); and complaints about the quality of the department's consultative service. The memorandum concludes by noting that plaintiff was being awarded a bonus of $100,000 "based on his and the Department's performance during 2008." Plaintiff's bonus for the previous year had been $125,000.

Another December 18, 2008 memorandum by Conaty notes that Montefiore had learned that plaintiff had forwarded to an outside consultant an internal Montefiore report on his record keeping, along with supporting patient records. The memorandum notes that plaintiff breached Montefiore's confidentiality policies by taking this action, which he did "without permission [from] or even notification to medical center administration." The memorandum concludes with the following admonition to plaintiff: "As a senior leader, you are expected to have a basic understanding of medical center policies, and to seek counsel

---

**9.** As previously noted, Montefiore already had uro-gynecological expertise in its OB/GYN department.

prior to undertaking potentially problematic actions if you are unclear about any aspect of those policies."

■ Given Montefiore's production of evidence of legitimate, nondiscriminatory reasons for setting plaintiff's compensation at the levels it chose, and ultimately to set RG's compensation at a higher level than his, the burden shifted back to plaintiff to raise a triable issue as to whether these reasons were pretextual by producing evidence tending to show "both that the stated reasons were false and that discrimination was the real reason" (*Forrest*, 3 NY3d at 305). Plaintiff fails to raise any issue on either score.

Plaintiff does not identify any evidence suggesting the falsity of Montefiore's proffered reasons for the challenged compensation decisions. In summary, those reasons were: (1) the need to raise the compensation of RG to retain the services of the only physician at Montefiore who performed robotic prostate surgery; (2) the documented problems with the urology department under plaintiff's chairmanship; and (3) the stagnation or decline of the monetary value of plaintiff's practice to the hospital (as measured by each of the four aforementioned indicators—charges, collections, RVUs, and OR cases) during the five years ending in 2008.[10]

While plaintiff questions Montefiore's business judgment in addressing the foregoing matters—suggesting, for example, that the departmental problems cited by Montefiore were "stale," not plaintiff's fault, and, in any event, outweighed by plaintiff's alleged achievements as chairman—an age discrimination plaintiff "must do more than challenge the employer's decision as contrary to 'sound business or economic policy,' since such an argument does not give rise to the inference that the [adverse action] was due to age discrimination" (*Bailey v New York Westchester Sq. Med. Ctr.*, 38 AD3d 119, 124 [2007], quoting *Ioele v Alden Press*, 145 AD2d 29, 37 [1989]; *see also Alvarado v Hotel*

---

10. The following are the figures for plaintiff's charges, collections, total RVUs, and OR cases for the years 2004 and 2008:

| | 2004 | 2008 |
| ------------ | ----------- | ----------- |
| Charges | $1,172,874 | $1,323,406 |
| Collections | $ 589,765 | $ 391,050 |
| Total RVUs | 13,116 | 8,592 |
| OR Cases | 135 | 136 |

*Salisbury, Inc.*, 38 AD3d 398 [2007] [same]).[11] In determining whether the reason for an adverse action was pretextual, "[i]t is not for the Court to decide whether the[ ] complaints [against plaintiff] were truthful or fair, as long as they were made in good faith" (*Saenger v Montefiore Med. Ctr.*, 706 F Supp 2d 494, 508 [SD NY 2010]; *see also Forrest*, 3 NY3d at 312 [on summary judgment motion in discrimination case, it was not "material whether defendants' contemporaneous assessment of plaintiff's recordkeeping skills was justified"]). "The mere fact that [plaintiff] may disagree with [his] employer's actions or think that [his] behavior was justified does not raise an inference of pretext" (*id.* [internal quotation marks omitted]). "[A] challenge . . . to the *correctness* of an employer's decision does not, without more, give rise to the inference that the [adverse action] was due to age discrimination" (*Kelderhouse v St. Cabrini Home*, 259 AD2d 938, 939 [1999], citing *Ioele*, 145 AD2d at 36-37; *see also Ospina v Susquehanna Anesthesia Affiliates, P.C.*, 23 AD3d 797, 799 [2005], *lv denied* 6 NY3d 705 [2006] [same]). Nor can plaintiff establish pretext "by rationalizing [his] errors or by blaming others" (*Saenger*, 706 F Supp 2d at 509 [internal quotation marks omitted]).

In sum, the court in an employment discrimination case "should not sit as a super-personnel department that reexamines an entity's business decisions" (*Baldwin v Cablevision Sys. Corp.*, 65 AD3d 961, 966 [2009], *lv denied* 14 NY3d 701 [2010] [internal quotation marks omitted]). As the Court of Appeals has stated: "[I]t matters not whether the [employer's] stated reason for [the challenged action] was a good reason, a bad reason, or a petty one. What matters is that the [employer's] stated reason for [the action] was nondiscriminatory" (*Forrest*, 3 NY3d at 308 n 5).

---

11. The dissent takes the position that plaintiff, without substantially controverting the truth of the deficiencies of his job performance adduced by Montefiore, has raised a triable issue by asserting that these matters were "stale" by the time of the complained-of adverse actions. In our view, the shortcomings to which Montefiore points are sufficiently close in time to the adverse actions that plaintiff cannot raise a triable issue merely by asserting that the matters were "stale." We further note that, on an appeal from an order granting summary judgment, the dissent's position that we should reverse cannot be justified by its citation to conclusory allegations in the complaint (such as that Foreman "[e]xaggerat[ed] and distort[ed]" plaintiff's shortcomings and "[f]ail[ed] to provide [him] with the same benefits" supposedly afforded other departmental heads). In opposing a summary judgment motion, a plaintiff is not entitled to rely on the allegations of the complaint; he or she is required to come forward with admissible evidence.

Nor has plaintiff adduced evidence tending to show that age discrimination was the real reason for Montefiore's determination to pay him less than he believed he deserved. Again, for present purposes, we assume that plaintiff met the minimal requirements of a prima facie case by pointing to the fact that the compensation of his younger subordinate RG ultimately exceeded his own and to a number of instances in which Foreman admitted that Montefiore forced out older departmental chairmen and replaced them with younger physicians. Even granting plaintiff this much, however, it does not follow that, in view of Montefiore's evidence of its legitimate, nondiscriminatory reasons for the challenged actions, plaintiff has come forward with sufficient evidence to go to trial on his claim of age discrimination.

This Court has observed that, in employment discrimination jurisprudence, "the term ' "prima facie case" ' is used . . . to denote the establishment by plaintiff of facts sufficient to create a 'legally mandatory, rebuttable presumption,' rather than the more traditional meaning of describing plaintiff's burden of setting forth sufficient evidence to go before the trier of fact" (*Sogg v American Airlines*, 193 AD2d 153, 156 n 2 [1993], *lv denied* 83 NY2d 754 [1994], citing *Texas Dept. of Community Affairs v Burdine*, 450 US 248, 254 n 7 [1981]). Thus, that an employee has made out a prima facie case under the *McDonnell Douglas* framework does not necessarily mean that he or she will succeed in defeating a summary judgment motion supported by admissible evidence of legitimate reasons for the employer's challenged action (*see Stephenson*, 6 NY3d at 271 [although "there was enough evidence . . . to establish a prima facie case" of age discrimination, "(a)fter the nondiscriminatory reasons were given and the burden shifted to them, plaintiffs did not prove that the reasons given were pretextual"]; *Forrest*, 3 NY3d at 307 ["plaintiff . . . cannot avoid summary judgment for defendants because, even assuming that she has made a prima facie showing . . . , she has failed to rebut defendant's proof that the purported termination did not arise under circumstances giving rise to an inference of discrimination"]; *Mete v New York State Off. of Mental Retardation & Dev. Disabilities*, 21 AD3d 288, 290 [2005] [affirming summary judgment dismissing discrimination claims although plaintiffs established a prima facie case]; *Roberts v Philip Morris Mgt. Corp.*, 288 AD2d 166, 166 [2001] [same]; *Schwaller*, 249 AD2d at 196-197 [same]; *Broome v Keener*, 236 AD2d at 498 [same]; *see also Abdu-*

*Brisson v Delta Air Lines, Inc.*, 239 F3d 456, 470 [2d Cir 2001], *cert denied* 534 US 993 [2001] ["Although Plaintiffs met their *de minimis* burden of establishing a *prima facie* case of age discrimination, they have failed to produce sufficient evidence to support a rational finding that the non-discriminatory business reasons proffered by the defendant for the challenged employment actions were false"]; *Saenger*, 706 F Supp 2d at 507-508 [granting employer summary judgment although age discrimination plaintiff made out a prima facie case]).

█ Our dissenting colleague, in support of his contention that Montefiore is not entitled to summary judgment, places great emphasis on the circumstance that a number of older departmental chairmen (none of whom testified or submitted an affidavit in this proceeding) left Montefiore involuntarily and were replaced by substantially younger physicians.[12] We have assumed that the departure and replacement of these physicians can support plaintiff's prima facie case. Nonetheless, this bare collateral circumstance, without a developed factual record illuminating why the other physicians were asked or encouraged to leave, cannot defeat a summary judgment motion based on uncontroverted evidence of legitimate, nondiscriminatory reasons for the employment decisions concerning plaintiff that are directly at issue in this action. While it was Montefiore's burden to come forward with evidence supporting the legitimate reasons it proffered for its adverse actions against plaintiff himself, we decline to impose on Montefiore the additional burden of justifying its

---

**12.** Viewing the record in the light most favorable to plaintiff, there appears to be admissible evidence that seven older physicians left Montefiore involuntarily. Specifically, Foreman testified at his deposition that the hospital urged these physicians to leave or declined to renew their contracts. Of these seven physicians, however, only two brought age discrimination lawsuits against Montefiore, and both suits were dismissed on summary judgment (*see Saenger v Montefiore Med. Ctr.*, 706 F Supp 2d 494 [2010], *supra*; *Trieger v Montefiore Med. Ctr.*, 3 Misc 3d 1103[A], 2004 NY Slip Op 50350[U] [2004], *affd* 15 AD3d 175 [2005], *lv denied* 4 NY3d 710 [2005]). We note that, since plaintiff does not claim to have had any direct involvement in Montefiore's dealings with other physicians, his own views on what occurred in those cases are pure speculation and, hence, inadmissible. While plaintiff apparently does not offer any hearsay to support his speculation that the other older chairmen were asked to leave based on their age, any such hearsay could not defeat summary judgment because—contrary to the dissent's assertion—plaintiff has not come forward with admissible evidence, either direct or circumstantial, that any of these other cases involved age discrimination. Again, a de minimis prima facie case under *McDonnell Douglas* (which is all the record shows with respect to each of the other older chairmen) does not equate to meeting a "plaintiff's burden of setting forth sufficient evidence to go before the trier of fact" (*Sogg*, 193 AD2d at 156 n 2).

conduct in collateral matters involving nonparty former employees when plaintiff has established only that those employees may have been able to satisfy the minimal requirements of a prima facie case in lawsuits of their own. If plaintiff believed that he could establish a pattern of actual age discrimination against other physicians, it was up to him to develop an evidentiary record from which a trier of fact could infer that such discrimination had actually been perpetrated. This he has not done.

As the dissenter himself acknowledged in his opinion in *Bennett*, the initial "de minimis prima facie showing" required of a plaintiff under *McDonnell Douglas* should not be conflated with the "frequently . . . onerous" showing required to defeat a well supported summary judgment motion (92 AD3d at 38). To reiterate, regarding the departures of the other chairmen, plaintiff has made, at most, a de minimis prima facie showing (i.e., that the other chairmen were in the protected class, were asked to leave, and were replaced by younger physicians). He has not come forward with evidence that discrimination actually occurred in the case of any of these former chairmen, and, to reiterate, in the only two of these cases in which Montefiore was sued, it was exonerated upon summary judgment.[13] It is the dissent's view that plaintiff, merely by demonstrating that a handful of other employees could have made a "de minimis prima facie showing" for themselves, somehow satisfies his own "onerous" burden of rebutting Montefiore's "proffered nondiscriminatory reasons" (*id.*) for its challenged actions in his particular case. This approach appears quite radical to us.

Aside from his failure to flesh out the facts underlying the departures of the other older departmental chairmen, plaintiff has not offered any statistical data or analysis that could support a finding of a pattern of age discrimination.[14] In particular, the record contains no information about terminations of younger physicians, so there is no basis to infer that older physicians

---

**13.** The dissent baselessly accuses us of "implying that the 'exoneration' of [Montefiore] in [*Saenger* and *Trieger*] should guide our reasoning in this case." We imply no such thing. What we do say is that those two cases, in which Montefiore was found to be entitled to dismissal of other physicians' discrimination claims against it as a matter of law, do not raise any issue of fact as to whether Montefiore discriminated against plaintiff.

**14.** By no means do we suggest that a claim under the NYCHRL must be supported by statistical data or analysis showing a pattern of discrimination. Here, however, in the absence of any other admissible evidence of discrimination to support his claim, plaintiff's failure to offer statistical evidence is fatal.

were terminated at a higher rate than younger physicians. In the absence of fuller statistical data and expert analysis thereof, plaintiff's cherry-picking of a handful of cases in which older physicians were asked to leave—and, again, the two former chairmen who sued Montefiore for discrimination had their claims dismissed upon Montefiore's motions for summary judgment—does not raise a triable issue as to the existence of a pattern of age discrimination (*see Saenger*, 706 F Supp 2d at 515-516).[15]

■ Plaintiff also relies on a total of three remarks by Foreman (to whom plaintiff attributes Montefiore's adverse actions against him) that are said to manifest bias against older physicians. This reliance is unavailing. Two of the remarks were simply positive references to "young" professionals that, in the absence of other evidence of ageist bias, do not imply any sinister aspersion on older workers.[16] Stray remarks such as these, even if made by a decision maker, do not, without more, constitute evidence of discrimination (*see Mete*, 21 AD3d at 294, citing *Danzer v Norden Sys., Inc.*, 151 F3d 50, 56 [2d Cir 1998]). The third remark, even further afield from the subject matter of this action, was simply Foreman's comment, in a newspaper article profiling him just before his retirement, on his own weakened physical condition as he battled a malignant brain tumor. Being a patient, Foreman said, is "not a preferred state,"

---

**15.** In fact, the statistical evidence in the record concerning the compensation of other departmental chairmen tends to refute any inference that age was a factor in setting their compensation. The record shows that some chairmen older than plaintiff or around the same age were paid more than he was, while some younger chairmen were paid less. For example, in the period ending June 23, 2007, the chairman of the dentistry department, who is only a year younger than plaintiff, made almost a million dollars more than he, while the chairman of the oncology department, who is 12 years younger than plaintiff, made $27,000 less. As of June 2007, plaintiff's compensation was $144,168 below the average compensation of older chairmen (born in 1942 or earlier) but only $80,635 less than the average compensation of younger chairmen (born in 1945 or later).

**16.** One of these remarks was made at a board meeting at which two of plaintiff's subordinates were making a presentation on surgical techniques. Foreman, in introducing the younger physicians, referred to them as part of the urology department's "wonderful young faculty." The other remark was made in the course of a lengthy interview conducted by the American Hospital Association, in which Foreman, discussing his efforts to put in place new leadership for Montefiore before his own retirement, stated: "So over the past year we put in place a whole series of moves including having [the previous chairman of the board] step down, having him replaced by a young trustee with enthusiasm and vigor and energy, and then that trustee has led a search to identify my successor."

to which he added: "I'm 72 years old and things happen to old men. Nobody knows that better than a doctor." We see no evidence of ageist bias in this rueful observation on what is, after all, an inescapable fact of life. In sum, the tiny number of stray, marginally age-related remarks that plaintiff cites, none of which concerned an employment decision, do not—even when viewed in the light most favorable to plaintiff—form a quantum of proof sufficient to support a finding that the legitimate reasons Montefiore proffered for its challenged actions were pretextual, either in whole or in part.

We have considered the remaining matters of which plaintiff complains and find that they do not raise a triable issue of pretext. To take one example, that Foreman steered Montefiore's chairman of the board (a personal friend) toward RG, rather than plaintiff, for surgery does not, by itself or in combination with the other evidence in the record, constitute even circumstantial evidence of age-based discrimination. In this regard, we note that it is undisputed that RG has certain skills and training that plaintiff lacks. To the extent plaintiff emphasizes that he subjectively felt "humiliated," "degraded" and "isolated" by the perceived slights of Foreman and other Montefiore executives, we find applicable the Court of Appeals' admonition that "mere personality conflicts must not be mistaken for unlawful discrimination, lest the antidiscrimination laws become a general civility code" (*Forrest*, 3 NY3d at 309 [internal quotation marks omitted]).[17]

█ The foregoing establishes that Montefiore is entitled to summary judgment when plaintiff's discrimination claim is analyzed under the *McDonnell Douglas* framework. As previously noted, however, this Court held in *Bennett* that summary judgment dismissing a claim under the NYCHRL should not be granted unless the claim also fails when analyzed under the

17. While we do not question the sincerity of plaintiff's expressions of distress, he seems, by his own account, to be unusually prone to interpret honors accorded to others as disrespect to himself and to react emotionally to such perceived slights. For example, plaintiff highlights as one of Montefiore's sins its choice of RG, rather than himself, to represent the urology department on a public relations video shown in the hospital's main entrance. Plaintiff testified that he is so "outraged" by his omission from the video that "I just walk past it and I don't watch it." This is presumably why plaintiff was unaware that the video featured other physicians of his approximate age, as detailed by Conaty. Conaty also explains that RG was chosen to represent urology in the video because, as previously noted, he was the only Montefiore physician able to perform robotic prostate surgery, a technique that has "revolutionized the treatment of prostate cancer."

somewhat more lenient mixed-motive framework. Again, although plaintiff has not requested that we subject his claim to a mixed-motive analysis, we conclude that use of that framework does not lead to a different result in this particular case.

Recognizing the mandate of the LCRRA to construe the NYCHRL as liberally as reasonably possible in favor of plaintiffs (*see Albunio*, 16 NY3d at 477-478) to the end that "discrimination should not play a role in [employment] decisions" (Rep of Governmental Affairs Div, Comm on Gen Welfare, Prop. Int. No. 22-A, Aug. 17, 2005, reprinted in 2005 NY City Legis Ann, at 537), we agree with the dissent that the plaintiff should prevail in an action under the NYCHRL if he or she proves that unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision (*see Williams v New York City Hous. Auth.*, 61 AD3d 62, 78 n 27 [2009], *lv denied* 13 NY3d 702 [2009] ["In the 'mixed motive' context, . . . the question on summary judgment is whether there exist triable issues of fact that discrimination was one of the motivating factors for the defendant's conduct"]; *Weiss v JPMorgan Chase & Co.*, 2010 WL 114248, 2010 US Dist LEXIS 2505 [SD NY 2010]; *cf.* 42 USC § 2000e-2 [m] ["an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice"]). If a plaintiff can prevail on a "mixed motive" theory, it follows that he or she need not prove that the reason proffered by the employer for the challenged action was actually false or entirely irrelevant. Rather, under this analysis, the employer's production of evidence of a legitimate reason for the challenged action shifts to the plaintiff the lesser burden of raising an issue as to whether the action was "motivated at least in part by . . . discrimination" (*Estate of Hamilton v City of New York*, 627 F3d 50, 56 [2d Cir 2010] [internal quotation marks omitted]) or, stated otherwise, was "more likely than not based in whole or in part on discrimination" (*Aulicino v New York City Dept. of Homeless Servs.*, 580 F3d 73, 80 [2d Cir 2009] [internal quotation marks omitted]).

Notwithstanding that, under the NYCHRL, a plaintiff may prevail on a mixed-motive theory, and that, under such a theory, he or she need not raise an issue as to the falsity or irrelevance of the reason the employer proffers for the challenged action, Montefiore is still entitled, on this record, to summary judg-

ment dismissing the instant plaintiff's discrimination claim. We believe that our previous discussion of the record suffices to establish that plaintiff has failed to come forward with any evidence—either direct or circumstantial—from which it could rationally be inferred that age discrimination was a motivating factor, even in part, for Montefiore's treatment of him. That is to say, the combined evidence on which plaintiff relies does not amount even to circumstantial evidence that age discrimination played any role in Montefiore's adverse decisions concerning his employment. Thus, the dissent's able arguments for a "mixed motive" analysis and for the sufficiency of circumstantial evidence do not, in our view, affect the outcome of this appeal.

Again, meeting the minimal requirements of a prima facie case—as we assume plaintiff has done—does not equate to creating a triable issue of fact in the face of admissible evidence that the employer had legitimate, nondiscriminatory reasons for the challenged decisions. Making out a prima facie case signals nothing more than the shift of the burden of production of evidence to the employer. Once the employer meets that burden by providing a legitimate reason for its action, the prima facie case does not necessarily entitle the employee to go to trial (*see Forrest*, 3 NY3d at 308 n 6 ["plaintiff's prima facie case, combined with *no* evidence that the stated justification is false other than plaintiff's unsupported assertion that this is so, may not" suffice to support a finding of unlawful discrimination]). This principle applies as much to "mixed motive" cases as to cases in which discrimination is alleged to have been the sole motive for the adverse action (*see Holcomb v Iona Coll.*, 521 F3d 130, 138 [2d Cir 2008] [noting, in a mixed-motive racial discrimination case, that "plaintiff may no longer rely on the presumption raised by the prima facie case" once the employer articulates a legitimate reason for its action]; *Campo v Slater*, 128 Fed Appx 173, 174-175 [2d Cir 2005] [while noting that plaintiff could defeat summary judgment by offering evidence that the "employment decision was more likely than not based in whole or in part on discrimination" and that plaintiff "made the minimal showing necessary to establish a *prima facie* case," the court affirmed summary judgment for defendant "because there is insufficient evidence from which a reasonable trier of fact could conclude that gender bias motivated" defendant's actions] [internal quotation marks omitted]).

 Finally, plaintiff's claim for retaliation was also correctly dismissed. Plaintiff first suggested the possibility that Monte-

fiore was discriminating against him in a letter to Foreman dated January 4, 2007, and filed the complaint in this action the following October.[18] In response to Montefiore's motion setting forth the reasons for its decisions, plaintiff failed to come forward with evidence that the hospital took any action against him after January 4, 2007, that constituted retaliation for his objecting to Montefiore's alleged discrimination within the meaning of Administrative Code § 8-107 (7) (defining retaliation as action "reasonably likely to deter a person from engaging in protected activity"). The actions by Montefiore that plaintiff seeks to cast as "retaliation" are chiefly the hospital's continuing the policies (e.g., paying him too little money and refusing to allow him to hire a uro-gynecologist) that had prompted him to complain in the first place. However, an employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation because, in that situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct (see *Clark County School Dist. v Breeden*, 532 US 268, 272 [2001]). Nor can Montefiore be deemed to have retaliated against plaintiff simply by denying that it was discriminating against him and confronting him with the professional lapses that were considered in setting his compensation. Plainly, an employer is entitled to defend itself against an employee's charges, even if the employee finds it searingly painful to hear himself criticized. Also without merit as a matter of law is the claim that Montefiore retaliated by reducing plaintiff's annual bonus by $25,000 (to $100,000) in December 2008. A year before, in December 2007—only two months after plaintiff filed the complaint in this action—Montefiore awarded him a bonus of $125,000, an increase of $25,000 over the 2006 bonus (awarded before plaintiff first complained of discrimination).

The dissent does not mention the foregoing allegations in its discussion of the retaliation claim, but brings up two other matters alleged by plaintiff, neither of which can support a retaliation claim. First, the dissent states that plaintiff complains that Montefiore's current president, Dr. Steven Safyer (who succeeded Foreman in January 2008), "refused to

---

**18.** In the letter of January 4, 2007, plaintiff claimed that his compensation was "beneath the level of my professional accomplishments," asserted that he could "reasonably conclude that my age has played a role in your unwarranted discrimination," and asked Foreman to "allay this fear."

talk with or deal with him.''[19] We do not see how such an amorphous allegation can be deemed to set forth a viable claim for retaliation, even under the liberal standard set by the LCRRA. Moreover, at his March 2009 deposition, Safyer testified (without contradiction in the record) that he had held 12 meetings with departmental chairs since becoming president, and plaintiff "has not come to one"—thereby establishing that plaintiff chose not to avail himself of numerous opportunities to meet with Safyer. The complaint about Safyer appears especially meritless given plaintiff's failure to allege either (1) what he wanted to discuss with Safyer (other than his perennial request to be allowed to hire a female urologist, which the hospital had been refusing—on perfectly reasonable grounds—for years), (2) how often he met with Foreman (the previous president) before raising his discrimination complaint, or (3) the amount of contact with the president of a major medical center that a chairman of a comparatively small department within the institution may reasonably expect to have. In the latter regard, plaintiff estimated at his deposition that Montefiore has 2,000 physicians. According to Conaty's affidavit, the urology department has only 10 physicians.[20]

The dissent also cites plaintiff's allegation that he has not been asked to serve on search committees for new departmental chairs (and unspecified "other committees") since he first raised the issue of discrimination in January 2007. However, Montefiore explains that the dean of the Albert Einstein College of Medicine, not Montefiore's administration, selects the members of chair search committees. Further, plaintiff points to no evidence of either (1) the frequency of his service on search committees before January 2007 or (2) the frequency with which

**19.** In fact, plaintiff complained at his deposition that Safyer met with him only once during Safyer's first year as president and, on that occasion, "kept looking at his watch and saying he had to go."

**20.** We are at a loss to understand the dissent's statement that "[t]he fact that plaintiff has not attended [Safyer's] meetings [with departmental chairs] is, at best, evidence that there have been fewer opportunities for plaintiff and [Safyer] to meet." That plaintiff does not dispute that he failed to attend 12 meetings with Safyer to which he was invited establishes not that plaintiff had "fewer opportunities" to meet with Safyer but that plaintiff had 12 opportunities to meet with Safyer and, for undisclosed reasons of his own, chose not to take advantage of any of them. Plaintiff's claim that Safyer refused to meet with him, when plaintiff himself could not be bothered to attend 12 meetings with Safyer to which he was invited, succinctly illustrates the borderline frivolous nature of this action. In essence, plaintiff cannot coherently complain that Safyer refused to meet with him when the record establishes that plaintiff spurned 12 invitations to meet with Safyer.

other departmental chairs serve on search committees. Accordingly, no inference of retaliation arises.[21]

At most, plaintiff has alleged that his charge of discrimination and subsequent lawsuit caused his personal relationship with Montefiore administrators to deteriorate. As a matter of common sense, this sort of breakdown in personal relations is inevitable once a serious lawsuit has been commenced. In any event, we find, as a matter of law, that plaintiff fails to allege any conduct by Montefiore causally connected to his charge of discrimination that rises to the level of actionable retaliation within the meaning of Administrative Code § 8-107 (7), namely, conduct *"reasonably* likely to deter a person from engaging in protected activity" (emphasis added).[22]

We recognize that the NYCHRL represents a determination by the City Council that invidious discrimination is a serious problem whose victims deserve a suitable legal remedy. Still, even after the passage of the LCRRA, not every plaintiff asserting a discrimination claim will be entitled to reach a jury, as *Bennett* illustrates. In this case, we find that, in response to Montefiore's uncontroverted evidence of its nondiscriminatory reasons for setting plaintiff's compensation at the levels it chose, plaintiff failed to come forward with evidence from which a jury reasonably could find that the challenged actions were motivated, either in whole or in part, by his age. Neither has plaintiff raised a triable issue as to whether Montefiore retaliated against him for asserting a claim for age discrimination. This being the

---

**21.** Although the dissent points out that "erosions of [an employee's] authority" may constitute retaliation, plaintiff does not identify any evidence in the record that Montefiore reduced his authority after he began complaining that his rights had been violated.

**22.** The Court of Appeals' decision in *Albunio v City of New York* (16 NY3d 472 [2011], *supra*) does not support reinstating plaintiff's retaliation claim. In *Albunio*, the Court of Appeals upheld a judgment in favor of two employees because the record contained evidence that each employee had been the subject of an adverse employment action after he or she had opposed unlawful discrimination by the employer against a third employee. In this case, while there is no question that plaintiff's complaints that his own rights were being violated constituted a protected action under the NYCHRL, he has failed to come forward with any evidence that Montefiore subjected him to new adverse action after he began complaining that could be found to constitute retaliation. It should be noted that some of the matters of which plaintiff complains under the rubric of "retaliation"—such as Safyer's failure to congratulate him on his inclusion on New York Magazine's 2008 "Best Doctors" list and the gruff manner in which Conaty told him, on one occasion, that he would not be allowed to hire a uro-gynecologist—are simply trivial, aside from having no discernible connection to age discrimination.

case, we see no justification for allowing this meritless lawsuit to continue to divert Montefiore's limited resources, and the time and attention of its staff, from the hospital's true mission of advancing medicine, protecting public health, and healing the sick.

Accordingly, the order of the Supreme Court, Bronx County (Mark Friedlander, J.), entered May 28, 2010, which granted defendant's motion for summary judgment dismissing the complaint, should be affirmed, without costs.

ACOSTA, J. (dissenting). If this case had come before us on appeal from a jury determination in defendant's favor, I would have no hesitation in concluding that the verdict was supported by sufficient evidence. But on a motion for summary judgment all reasonable inferences must be drawn in favor of the non-moving party. In the context of an action brought pursuant to the New York City Human Rights Law, Administrative Code of the City of New York § 8-101 *et seq.* (City HRL), the court is required to recognize that discrimination is not only prohibited from being the *entire* reason for adverse action, but also prohibited from being *any part* of the reason for adverse action (*see* Administrative Code of City of NY § 8-107). Here, the motion court resolved factual issues in favor of the moving party. These issues include whether defendant engaged in retaliation against plaintiff for his protesting its alleged age discrimination against him. I therefore respectfully dissent from the majority's decision to affirm the grant of summary judgment.

Evidentiary Framework

The core difference between the majority and myself in this case does not concern the validity of the framework that this Court established in *Bennett v Health Mgt. Sys., Inc.* (92 AD3d 29 [2011], *lv denied* 18 NY3d 811 [2012]). Rather, our disagreement concerns how much of an inference we are willing to draw in favor of the plaintiff in what I admit is a close case.

As this Court made clear in *Bennett,*

"[T]he identification of the framework for evaluating the sufficiency of evidence in discrimination cases does not in any way constitute an exception to the section 8-130 rule that all aspects of the City HRL must be interpreted so as to accomplish the uniquely broad and remedial purposes of the law" (92 AD3d at 34-35).

The Local Civil Rights Restoration Act of 2005 (Local Law No.

85 [2005] of City of NY) contemplated that the courts would elaborate an evidentiary framework that would best achieve the uniquely broad remedial purposes of the City HRL. Thus, this Court instructed:

> "Where a defendant has put forward evidence of one or more nondiscriminatory motivations for its actions . . . a court should ordinarily avoid the unnecessary and sometimes confusing effort of going back to the question of whether a prima facie case has been made out. Instead, it should turn to the question of whether the defendant has sufficiently met its burden, as the moving party, of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under *any of the evidentiary routes—McDonnell Douglas, mixed motive, 'direct' evidence, or some combination thereof*" (*Bennett*, 92 AD3d at 45 [emphasis added]).[1]

### Age Discrimination

I agree with the majority that defendant met its burden of putting forward evidence of one or more nondiscriminatory motives for its actions. I am concerned, however, that the majority has performed quintessential jury functions by resolving

---

1. One of those routes—mixed motive—describes a circumstance of "partial" discrimination, which is proscribed under the City HRL since, "[u]nder Administrative Code § 8-101, discrimination shall play no role in decisions relating to employment, housing or public accommodations" (*id.* at 40, quoting *Williams v New York City Hous. Auth.*, 61 AD3d 62, 78 n 27 [2009], *lv denied* 13 NY3d 702 [2009]; *cf.* Rep of Governmental Affairs Div, Comm on Gen Welfare, Prop. Int. No. 22-A, Aug. 17, 2005, reprinted in 2005 NY City Legis Ann, at 537; *Weiss v JPMorgan Chase & Co.*, 2010 WL 114248, *1, 2010 US Dist LEXIS 2505, *2 [SD NY 2010] [the City HRL "requires only that a plaintiff prove that age was 'a motivating factor' for an adverse employment action"]).

The approach this Court set forth in *Bennett* is consistent with the Court of Appeals' recognition that "we must construe Administrative Code § 8-107 (7), *like other provisions of the City's Human Rights Law,* broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (*Albunio v City of New York*, 16 NY3d 472, 477-478 [2011] [emphasis added]). Construing the "because of" language of Administrative Code § 8-107 (1) (a) to mean that the discrimination was "a motivating factor," even if not the sole motivating factor, is very clearly "reasonably possible" (*compare Albunio* at 477-479 [broadly construing the phrase "opposed any practice forbidden under this chapter" (Administrative Code § 8-107 [7]) in the City HRL to include implicit disapproval of discrimination]).

whether plaintiff ultimately succeeded in proving discrimination through the *McDonnell Douglas* route as modified by *Bennett* or the mixed-motive route.

By enacting the City HRL, the New York City Council made it illegal to discriminate against an employee "in compensation or in terms, conditions or privileges of employment" (Administrative Code § 8-107 [1] [a]). Notwithstanding the majority's undue emphasis on the compensation aspect of plaintiff's age discrimination claim, the City HRL, by its own terms, was enacted to protect more than just dollars and cents.[2] Indeed, in his complaint, plaintiff also alleges that he "has been humiliated, demeaned, and degraded." He alleges that Dr. Spencer Foreman, former president and chief executive officer of Montefiore, inter alia, "[e]xaggerat[ed] and distort[ed] events involving [plaintiff], with respect to certain administrative issues in an effort to create and support arguments that Montefiore could then use to strike out at [plaintiff]," and that Foreman "[f]ailed to provide [plaintiff] with the same benefits made available to Montefiore's department heads."

If, as plaintiff also alleges, his claimed failures of performance were "stale" by the time of the adverse actions in question, he is not simply questioning defendant's "business judgment." On the contrary, an argument of this nature raises an important question as to defendant's credibility: Would the institution or hospital be taking current action against an employee because of "old business"? A jury, after weighing all the evidence, might or might not conclude that defendant was doing exactly that. Thus, resolving the question is not the function of a court on a motion for summary judgment.

In that vein, "[a]n employer's invocation of the business judgment rule does not insulate its decisions from all scrutiny in a discrimination case" (*Weiss v JPMorgan Chase & Co.*, 332 Fed Appx 659, 663 [2d Cir 2009]). After all, "facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness" (*Dister v Continental Group, Inc.*, 859 F2d

---

2. This is also true of federal law (*see e.g. Wanamaker v Columbian Rope Co.*, 108 F3d 462, 466 [2d Cir 1997] ["We recognize that, as in retaliation cases brought under Title VII, *the ADEA does not define adverse employment action solely in terms of* job termination or *reduced wages and benefits*, and that less flagrant reprisals by employers may indeed be adverse"] [emphasis added]). The Restoration Act recognizes federal and state civil rights provisions as "a floor below which the City's Human Rights law cannot fall" (Local Law No. 85 § 1; *see Loeffler v Staten Is. Univ. Hosp.*, 582 F3d 268, 278 [2009]).

1108, 1116 [2d Cir 1988]). Thus, contrary to the majority, I would not allow defendant to shield its potentially discriminatory actions from judicial scrutiny by merely uttering the words "business judgment."

While the Court of Appeals' construction of the City HRL in *Forrest v Jewish Guild for the Blind* (3 NY3d 295 [2004]) was rejected by the City Council when it enacted the Restoration Act,[3] the majority nonetheless quotes *Forrest*'s statement that "it matters not whether the [employer's] stated reason for [the challenged action] was a good reason, a bad reason, or a petty one. What matters is that the [employer's] stated reason for [the action] was nondiscriminatory" (3 NY3d at 308 n 5). That proposition is dubious since the mere existence of "[a] legitimate reason for [a challenged action] . . . is not always mutually exclusive of a discriminatory or retaliatory motive and thus does not preclude the possibility that a discriminatory or retaliatory motive played a role in [the challenged] decision" (*Gossett v Tractor Supply Co., Inc.*, 320 SW3d 777, 782 [2010]). Indeed, in construing the City HRL, this Court has consistently required that a defendant employer offer a nondiscriminatory reason (and evidence to support its proffered explanation) that specifically addresses and disproves the plaintiff's allegations (*see e.g. Carryl v MacKay Shields, LLC*, 93 AD3d 589 [2012] ["Defendant . . . explained that, though (plaintiff and his coworker) shared the same title and primary responsibilities, plaintiff and his Caucasian 'peer' were not similarly situated"]; *Bennett*, 92 AD3d at 46). Here, defendant has failed to meet that burden.

As the majority acknowledges, the evidence, viewed in the light most favorable to plaintiff, shows that "seven older physicians left Montefiore *involuntarily*" (emphasis added). While this evidence is not in itself dispositive of the existence of age discrimination, it is certainly much more than a "collateral matter[ ]" that the majority does not wish to bother justifying. If an employer is treating employees less well because of their age, that same employer may well be paying older employees who refuse to leave *less than they would be paid* in the absence of age discrimination (*see e.g. Murphy v American Home Prods. Corp.*, 159 AD2d 46, 49-50 [1990] [evidence indicating employer's discriminatory treatment of employees other than plaintiff relevant "since such evidence is highly probative of the employer's actual state of mind"]).

---

3. *See Bennett*, 92 AD3d at 35 n 1, citing *Williams*, 61 AD3d at 67.

The majority maintains that

> "the statistical evidence in the record concerning the compensation of other departmental chairmen tends to refute any inference that age was a factor in setting their compensation. The record shows that some chairmen older than plaintiff or around the same age were paid more than he was, while some younger chairmen were paid less."

It is beyond cavil, however, that an employer need not engage in a consistent pattern of discrimination in order to discriminate against a particular individual on account of his or her protected status (*see Brown v Henderson*, 257 F3d 246, 253 [2d Cir 2001] ["whether an employer discriminates against only a subset of a protected class, or discriminates inconsistently, Title VII nevertheless protects any individual so long as that individual is mistreated because of (his protected status)"] [citation omitted]; *Hodges v Rensselaer Hartfor Graduate Ctr., Inc.*, 2008 WL 793594, *6, 2008 US Dist LEXIS 22228, *18 [D Conn 2008] ["The failure of a decision-maker to discriminate against other members of the protected class does not give rise to an inference that the decision-maker did not discriminate against Plaintiff"]; *see also Holcomb v Iona Coll.*, 521 F3d 130, 140 [2d Cir 2008] [the fact that the employer did not terminate another employee who was also in an interracial marriage "does not allay the suspicion that the firings were grounded in an illegitimate motive"]). Not all individuals manifest the particular traits that lead others to discriminate against them on the basis of their membership in a protected group (*see e.g.* Charles A. Lofgren, The Plessy Case: A Legal-Historical Interpretation, at 41 [Oxford University Press 1987] ["Plessy's (arrest) was surely arranged, because despite the allegation in the arresting officer's affidavit that Plessy was 'a passenger of the colored race,' he . . . was only one-eighth black and, as his counsel later asserted, 'the mixture of colored blood (was) not discernible' "]). Similarly, not all employers have an unfettered ability to act on their biases.[4] Thus, what matters in an employment discrimination suit is whether a particular *individual* has been the victim of illegal discrimination (*cf. Brown*, 257 F3d at 253-254 ["what matters in the end is not how the employer treated *other* employees, if any, of a different (protected status), but how the employer *would have* treated *the plaintiff* had she been of a different (protected status)"]). Defendant Montefiore "may not

---

4. This is particularly so in the context of a large institution where there may be checks (i.e., a board of overseers) on an employer's powers.

escape liability for discriminating against a given employee on the basis of [his or her protected status] simply because it can prove it treated other members of the employee's group favorably" (*Graham v Long Is. R.R.*, 230 F3d 34, 43 [2d Cir 2000]). Nor does it matter that some of the younger chairmen were paid less than plaintiff (*cf. Brown*, 257 F3d at 253; *Pitre v Western Elec. Co., Inc.*, 843 F2d 1262, 1272 [10th Cir 1988] ["an employer is not immunized from liability simply because some males received detriments before or contemporaneously with a Title VII plaintiff"]).

"[E]mployment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent" (*Rosen v Thornburgh*, 928 F2d 528, 533 [2d Cir 1991]). Thus, what is not explained is often as important as what is explained. Here, plaintiff identified and defendant conceded that there was a series of employees in their 60s and 70s who ended their employment at defendant's urging and were replaced by younger employees. For example, the 65-year-old chairman of orthopedics was, in the words of defendant, "encouraged" to leave, the director of infectious disease and the chairman of gastroenterology, both in their 60s, were "asked to leave," and the director of pediatric endocrinology, in his late 60s, was "pushed out."[5] Despite admitting that a series of older employees left involuntarily and were replaced by younger employees, defendant did not show that all the firings were prompted by nondiscriminatory motives.[6] De-

---

5. Given the concession made by defendant's representative in the course of his deposition, I am at a loss as to how the statements made by plaintiff concerning the various physicians who were terminated involuntarily constitute hearsay. In any event, to the extent those statements are indeed hearsay, they are admissible to defeat a motion for summary judgment since other evidence has been offered to support plaintiff's claim of discrimination (*see Schwaller v Squire Sanders & Dempsey*, 249 AD2d 195, 197 [1998]).

6. The majority contends that the grant of summary judgment dismissing cases against defendant in *Saenger v Montefiore Med. Ctr.* (706 F Supp 2d 494 [2010]) and *Trieger v Montefiore Med. Ctr.* (3 Misc 3d 1103[A], 2004 NY Slip Op 50350[U] [2004], *affd* 15 AD3d 175 [2005], *lv denied* 4 NY3d 710 [2005]) constitutes an "exoneration" of defendant, as if implying that the "exoneration" of defendant in those suits should guide our reasoning in this case. It is entirely possible that defendant was indeed "not guilty" of the accusations made against it in *Saenger* and *Trieger*. That is, of course, immaterial since (1) this suit concerns an entirely different plaintiff, and we do not judge a party's "innocence" on the basis of whether it has previously been "exonerated" or "convicted," and (2) the outcome of *Saenger* and *Trieger* does not

fendant, as the proponent of summary judgment, bears the burden of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes (*DeNigris v New York City Health & Hosps. Corp.*, 2012 WL 955382, *7 n 5, 2012 US Dist LEXIS 39321, *21 n 5 [SD NY 2012], quoting *Bennett*, 92 AD3d at 41). Defendant's perfunctory and unsubstantiated claim that replacing older individuals with younger individuals somehow constitutes a "natural occurrence" is insufficient to defeat the inference that this Court must draw in favor of the plaintiff.[7] Viewed in the light most favorable to plaintiff, the evidence *could* suggest that complaints about plaintiff's performance were not the only factors that motivated the complained-of behavior. Accordingly, it is relevant to the *McDonnell Douglas* analysis.

In a close case, this Court should not substitute its judgment for that of a jury (*cf. Albunio v City of New York*, 16 NY3d 472 [2011] [upholding a jury verdict for a plaintiff in a case that is a "closer" call]; *Vivenzio v City of Syracuse*, 611 F3d 98, 106 [2d Cir 2010] ["It is not the province of the court itself to decide what inferences should be drawn . . . ; if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper"] [internal quotation marks omitted]; *Carlton v Mystic Transp., Inc.*, 202 F3d 129, 134 [2d Cir 2000],

---

overcome the inference that we must draw against defendant for failing to establish the propriety of its actions vis-à-vis the numerous senior physicians whom it let go. To be sure, the bases for "exoneration" in those suits are unrelated to the pertinent issues in this case. The plaintiff in *Trieger* was fired for insubordination after he publicized a scathing memo attacking the administration (2004 NY Slip Op 50350[U], *4), while the plaintiff in *Saenger* was fired after physically assaulting a staff person and being accused of sexual harassment by several women (706 F Supp 2d at 497). In any event, I would note that *Saenger* and *Trieger* were decided under an entirely different standard from the one that this Court must apply in this case.

7. The majority quotes *Forrest* stating that "the plaintiff must prove that the legitimate reasons proffered by the defendant were merely a pretext for discrimination by demonstrating both that the stated reasons were false and that discrimination was the real reason" (3 NY3d at 305). As previously indicated, the analysis in that case was rejected by the City Council when it enacted the Restoration Act. In the first case in which this Court analyzed the burden on a plaintiff opposing summary judgment under the City HRL following the Restoration Act, we construed the City HRL as permitting plaintiffs to go before a jury if there was "some evidence that at least one of the reasons proffered by defendant is false, *misleading, or incomplete*" (*Bennett*, 92 AD3d at 43 [emphasis added]). Here, the majority inexplicably disregards that aspect of the *Bennett* standard, which other panels of this Court have embraced (*see e.g. Sandiford v City of New York Dept. of Educ.*, 94 AD3d 593, 595 [2012]).

*cert denied* 530 US 1261 [2000] ["Because this is a discrimina-
tion case where intent and state of mind are in dispute, sum-
mary judgment is ordinarily inappropriate"]). A jury might be
less inclined to view plaintiff as a single "outlier with a
problem" than as one of a number of older employees with neg-
ative experiences; the jury might also consider whether the
"natural occurrence" rationale advanced by defendant was pre-
textual (*see Bennett*, 92 AD3d at 43 n 13 ["If one explanation of-
fered by a defendant is able to be construed by a jury as false
and therefore evidence of consciousness of guilt, that same jury
would be permitted to weigh that evidence when assessing the
veracity of the other explanations the defendant has offered"]).
Of course, a jury could ultimately conclude that defendant's
failure to offer any substantive reason for the other departures
of the other older physicians was not sufficient to convince it,
on any theory, that discrimination played any part in defend-
ant's decisions affecting plaintiff. But that, again, is something
the jury should be allowed to determine.

The fact that other older employees were forced to leave is
also relevant to the strength or weakness of the mixed-motive
case. Even if defendant genuinely believed the negative things it
said about plaintiff, a jury might conclude that one element of
defendant's motivation was plaintiff's age.

It is also necessary to point out that the record reflects other
evidence that would allow a jury to infer that the reasons prof-
fered by defendant were not a complete explanation for its treat-
ment of plaintiff. Robert B. Conaty, defendant's executive vice-
president for operations, who reviewed annual compensation for
department chairs, asserted that the "rank, longevity or profes-
sional accomplishments" of a department chair were not mate-
rial to their compensation. Conaty averred that the chairman's
reputation and success, his ability "to attract quality faculty
and mentor them," along with his "ability to generate income
for the Medical Center," were factors in determining compensa-
tion.

Melman's success as chairman of the urology department
included the publication of hundreds of academic articles in
prestigious medical journals, many of which were coauthored by
the department's resident physicians, bolstering the residents'
post-training professional pursuits; authoring 42 textbook
chapters; expanding the department's laboratory and research
space; and teaching thousands of students and resident physi-
cians. Foreman, defendant's president and chief executive offi-

cer, acknowledged that plaintiff brought more than $200 million into what Conaty described as defendant's "very small" urology department. Whether these accomplishments belied what defendant described as the seriousness of plaintiff's shortcomings was a question of fact for the jury.[8]

Finally, it bears mentioning that the motion court improperly relied on the idea that the existence of "animus" is a necessary element of a discrimination claim (*Melman v Montefiore Med. Ctr.*, 36 Misc 3d 1216[A], 2010 NY Slip Op 52453[U], *3). On the contrary, the law has long been clear that intentional discrimination simply involves intentionally treating one person less well than another because of protected class status; it does not require evidence of animus.[9]

Retaliation

In addition to his discrimination claim, plaintiff also brought a claim of retaliation. To establish a retaliation claim under the City HRL, a plaintiff must make out a prima facie case that: (1)

8. Conaty's denial that he thought that a January 4, 2007 letter from plaintiff to Foreman was a complaint of age discrimination could have been viewed by a jury as disingenuous, and therefore could have allowed a jury to be doubtful of Conaty's proffered explanation for defendant's conduct. The letter says explicitly that plaintiff was then in a position to "reasonably conclude that my age has played a role in your unwarranted discrimination."

9. For example, in *United States v Wagner* (940 F Supp 972, 980 [ND Tex 1996]), the court stated that the plaintiffs were not required to show that the defendants had any dislike of or animosity towards the disabled plaintiff because of her disability, only that the fact of the disability was a motivating factor in the defendants' actions and decisions. A party who intentionally treats someone differently because of disability is not protected from liability by virtue of a sincere belief in stereotypes relating to the needs and abilities of persons with disabilities. "Whether motivated by animus, paternalism, or economic considerations, intentional handicap discrimination is prohibited by the Act" (*id.* [internal quotation marks omitted]; *see also Village of Bellwood v Dwivedi*, 895 F2d 1521, 1530-1531 [7th Cir 1990] [treating potential housing customers differently because of their race, even for nonracist reasons, is unlawful]; *Williams v Matthews Co.*, 499 F2d 819, 827 [8th Cir 1974], *cert denied* 419 US 1022 [1974] [subjective good intentions do not overcome intentional discrimination in housing]; *United States v Pelzer Realty Co., Inc.*, 484 F2d 438, 443 [5th Cir 1973], *cert denied*, 416 US 936 [1974] [unnecessary to find that "racial prejudice dominated (defendant's) mind during the negotiations"]; *Pederson v Louisiana State Univ.*, 213 F3d 858, 880 [5th Cir 2000] ["If an institution makes a decision not to provide equal athletic opportunities for its female students because of paternalism and stereotypical assumptions about their interests and abilities, that institution intended to treat women differently because of their sex"]; *Emmel v Coca-Cola Bottling Co. of Chicago*, 95 F3d 627, 634 [7th Cir 1996] ["paternalistic reason" for denying promotion, such as belief that job is "too confrontational or unpleasant for a woman" will not "withstand scrutiny" under Title VII]).

he participated in a protected activity known to the defendant; (2) the defendant took an employment action that disadvantaged the plaintiff; and (3) a causal connection exists between the protected activity and the adverse employment action (*see Farrugia v North Shore Univ. Hosp.*, 13 Misc 3d 740, 752 [2006]).

Plaintiff testified both that his compensation was affected and that he was isolated and marginalized. In respect to the latter, the motion court simply ignored evidence in the record. Plaintiff testified, for example, that defendant's new president refused to talk with or deal with him, and that, contrary to past practice, after plaintiff complained of discrimination, defendant no longer asked him to serve on search committees or other committees. Thus, contrary to the majority's contention, the actions that form the basis of plaintiff's retaliation complaint are not merely a "continu[ation of] the policies . . . that had prompted him to complain in the first place."

With respect to a defendant's actions that allegedly isolate and marginalize the plaintiff, the City HRL is clear that

> "the assessment [must] be made with a keen sense of workplace realities, of the fact that the 'chilling effect' of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct in light of those realities. Accordingly, the language of the City HRL does not permit any type of challenged conduct to be categorically rejected as nonactionable. On the contrary, no challenged conduct may be deemed non-retaliatory before a determination that a jury could not reasonably conclude from the evidence that such conduct was, in the words of the statute, 'reasonably likely to deter a person from engaging in protected activity' " (*Williams v New York City Hous. Auth.*, 61 AD3d 62, 71 [2009], *supra* [footnote omitted]).

It would not be difficult for a jury to believe that a person would be less likely to complain of discrimination if he knew in advance that doing so would result in isolation or marginalization such as plaintiff described. For the chair of a department of a medical center, not being able to participate in committees is a significant element of the terms and conditions of employment. Moreover, the message sent to the chair's colleagues by the chair's enforced nonparticipation is profoundly negative and could easily be found to be the type of retaliatory behavior that

could deter a person from engaging in protected activity (*compare Albunio*, 16 NY3d at 476 [being "*shunned and excluded from meetings*" by a supervisor constituted an adverse employment action] [emphasis added]). The same would be true if the effect of complaining about discrimination was that the employee had less access to the hospital president than he had before.[10] This Court has found that such erosions of authority (e.g., exclusion from committees), when they follow the exercise of rights by a plaintiff with a good employment record are causally connected (*see Albunio v City of New York*, 67 AD3d 407, 408 [2009], *affd* 16 NY3d 472 [2011]). I would find, similarly, in this case a causal connection between plaintiff's complaint that defendant discriminated against him and defendant's subsequent isolation or marginalization of him.

In short, plaintiff's allegations of isolation and marginalization are neither "amorphous" nor benign. And they should not be regarded as an inevitable or acceptable consequence of complaining of discrimination. Defendants are free to be unhappy about being sued, but one of the core purposes of anti-retaliation law is to prevent that unhappiness from infecting the way an employee is treated. An employee who has complained of discrimination must be afforded the same full participation in the business affairs of the defendant that is afforded to an equally situated employee who has not complained about discrimination. This is especially true under the City HRL, which proscribes retaliation "in any manner" (Administrative Code § 8-107 [7]). It is of no consequence that the harm suffered by the plaintiff may not have been significant, as the " 'degree of harm suffered by the individual "goes to the issue of damages, not liability" ' " (*Farrugia*, 13 Misc 3d at 752 n 4, quoting Craig Gurian, *A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law*, 33 Fordham Urb LJ 255, 320 [2006], quoting 2 EEOC Compliance

---

**10.** The majority notes that plaintiff did not dispute defendant's representation that he failed to attend all the meetings that Dr. Steven Safyer has held since he succeeded Foreman as president. The fact that plaintiff has not attended those meetings is, at best, evidence that there have been fewer opportunities for plaintiff and defendant to meet. It does not prove that defendant is not avoiding plaintiff.

The majority's attempt to infer defendant's mental state (i.e., intent) on the basis of plaintiff's action (or failure to act) is an inappropriate invasion of the jury's province. Here, only a jury can make the credibility determination whether Safyer, who was deposed in this case, has been dismissive of plaintiff. Defendant's characterization of Safyer's intent is inappropriate, especially in light of plaintiff's evidence of Safyer's animus against him.

Manual § 8, at 8-13 [1998]). Plaintiff has presented evidence of isolation and marginalization that a jury should be allowed to assess. While his case may not be factually compelling, it is no less so than Albunio's case.[11] In short, the majority here should not regard a "closer case" as an invitation to deny the plaintiff his day in court (*see Albunio v City of New York*, 16 NY3d 472 [2011], *supra*).

Finally, it is incumbent upon the members of this panel to give "full effect" to this Court's and the Court of Appeals' precedents (*see Ortega v City of New York*, 95 AD3d 125, 129 n [2012], citing *Matter of Midland Ins. Co.*, 71 AD3d 221 [2010]). By ruling as a matter of law for defendant in this case, I believe that the majority is unjustifiably raising the evidentiary requirements to bring a claim for retaliation under the City HRL higher that this Court and the Court of Appeals have found necessary.

DeGrasse and Richter, JJ., concur with Friedman, J.P.; Acosta, J., dissents in a separate opinion.

Order, Supreme Court, Bronx County, entered May 28, 2010, affirmed, without costs.

---

11. Notably, in *Albunio*, this Court and the Court of Appeals upheld a jury verdict in favor of a plaintiff (Albunio) who took no explicit action—unlike plaintiff in this case—to earn the animosity of her employer (16 NY3d at 479).