| **Pogil v KMPG, LLP** |
| 2024 NY Slip Op 30340(U) |
| January 29, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 150640/2021 |
| Judge: Shlomo S. Hagler |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

ǀ

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:     **HON. SHLOMO S. HAGLER**                    PART                    **17**

*Justice*

---------------------------------------------------------------------X

BORIS POGIL,

                        Plaintiff,

                 - v -

KPMG, LLP, ANDREW J ZIEGLER, SCOTT M MASAITIS,
TONYA CHRISTIANSON, DAVID LIN, LENA HAIDYSH,
LARA CZERWINSKI, SCOTT NOVICK

                      Defendant.

---------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 150640/2021 |
| MOTION DATE | 04/10/2023 |
| MOTION SEQ. NO. | 005 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 005) 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 162

were read on this motion to/for                    JUDGMENT - SUMMARY                    .

Defendants KPMG, LLP, Andrew Ziegler, Scott Masaitis, Tonya Christianson, David

Lin, Lena Haidysh, Lara Czerwinski, and Scott Novick (collectively, "Defendants") move for

summary judgment dismissing plaintiff Boris Pogil's claims for defamation, discrimination, and

retaliation as against them. Plaintiff opposes this motion.

## FACTS

### I.    Plaintiff's Utilization and Performance

Plaintiff Boris Pogil began working at KPMG LLP as a Senior Tax Associate on April 2,

2018 (Defendant's Memorandum of Law in Support ("Memo") [NYSCEF Doc. No. 82] at 2; *see*

*also* Amended Complaint ("Compl.") [NYSCEF Doc. No. 42] at 1). He worked in the New York

Metro ("NYMetro") office in the Mergers & Acquisitions Tax ("M&A Tax") group (Memo at

2). NYMetro is within KPMG's Eastern Region (*see id.*). Plaintiff had experience in M&A Tax

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 1 of 27

before being hired at KPMG and in 2019, hoped to be promoted (*see id.*; Masaitis Aff. [NYSCEF Doc. No. 77] ¶ 7). However, plaintiff met with Defendant Scott Masaitis, a Principal at KPMG and the head of the Eastern Region, on August 23, 2019 where plaintiff was told he would not be getting promoted (*see* Masaitis Aff. ¶¶ 1, 11). Masaitis gave plaintiff advice to work hard and improve in his performance so that he may be considered for a promotion in fiscal year (FY) 2020 (*see id.* ¶ 11). At this time plaintiff's Utilization was 57%, which was below the target of 70% (*see id.*). Utilization "measures the hours worked that are chargeable to clients" and is the "most important performance metric for Senior[ Associates]" (Memo at 2). Senior Associates' Utilization is tracked on a weekly, monthly, and year-to-date basis (*id.* at 3). For the first quarter of FY 2020, however, plaintiff "was the lowest utilized Senior Associate in NYMetro and the second lowest in the Eastern Region" (Masaitis Aff. ¶ 13). In December 2019 plaintiff's year-to-date Utilization was 9.8%, the third worst among all M&A Tax Senior Associates (*see* Lin Aff. [NYSCEF Doc. No. 79] ¶ 7; Ex. 2 to Lin Aff. [NYSCEF Doc. No. 80]). He was notified at the end of January that he had the lowest year-to-date utilization among all Senior Associates in the NYMetro location (*see* Masaitis Aff. ¶ 15).

"When Associates and Senior Associates do not have enough M&A Tax work to keep them busy, they are supposed to seek out and accept work from other Tax practices" (Lin Aff. ¶ 9). Defendant David Lin is the National Resource Manager for the M&A Tax practice (*see id.* ¶ 1). He works with the Associates and Senior Associates in the M&A Tax group to increase Utilization and decrease uncharged or unassigned time (*see id.* ¶ 2). In November 2019 Defendant Lin reached out to plaintiff via email asking him to work on a time-sensitive and important project in M&A Tax, but plaintiff turned the opportunity down despite having poor Utilization and low chargeable hours (*see id.* ¶ 5).

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 2 of 27

Defendant Lin reached out again in January 2020 to ask plaintiff if he would be willing to work on a project within the Business Tax Services practice (*see id.* ¶ 10). Plaintiff was reluctant to accept the project because he was not sure he felt comfortable doing that specific type of work (*see id.*). Later that day, Lin reached out again offering plaintiff a different project within the Business Tax Services practice that would provide plaintiff with 50 chargeable hours (*see id.* ¶ 11). Plaintiff responded via email that he wanted to pass on this opportunity but "I don't want to let you down . . . If you cant [sic] find anyone else and they absolutely need me then I will do it" (Ex. 5 to Lin Aff.). Eventually, plaintiff responded "Let me skip this then. I still have a few small deals on plate [sic] to keep me busy until bigger things come in" (*id.*).

Defendant Andrew Ziegler was a Managing Director at KPMG and served as plaintiff's People Management Leader starting in October 2019 (Ziegler Aff. [NYSCEF Doc. No. 75] ¶¶ 1-2). On February 4, 2020, Ziegler and a nonparty partner in M&A Tax named Larry Piccola met with plaintiff regarding his low Utilization (*id.* ¶ 7). Ziegler "reiterated to Boris that he needed to be chargeable and to increase his Utilization" and that he should "take on available tax work, even if it was outside M&A Tax" (*id.*). In this meeting, Ziegler questioned why plaintiff had not volunteered for a long-term project that would provide a high number of chargeable hours (*see id.*). Plaintiff responded that he did not want to take the project since it was based in California and he had a wife and young child (*see id.*). After this meeting, plaintiff approached Lin and informed Lin that plaintiff would "take any work that comes in" (Lin Aff. ¶ 11).

The next day, Lin informed plaintiff of another opportunity in the Business Tax Services practice that would "provide a lot of chargeable hours" (*id.* ¶ 12). Plaintiff told Lin he would take on that project (*id.*). However, the following day, February 6, 2020, plaintiff told Lin that he changed his mind and "pulled out of the assignment" (Ex. 10 to Lin Aff.). He told Lin that he is

150640/2021 POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 3 of 27

3 of 27

[* 3]

"only interested in M&A work" (*id.*). Lin informed defendants Ziegler and Masaitis, as well as partner Larry Piccola, of this via email (*see id.*). Plaintiff messaged a coworker that day that he "told [Lin] to take me off the BTS stuff" and that he was "only going to do M&A work or study for my exams on my down time . . . whatever happens happens" (Ex. D to Abrams Aff. [NYSCEF Doc. No. 72]).

Masaitis stated in his affidavit that he thought this constituted low performance and, because plaintiff was aware of his low Utilization, "he should not have been turning down available Tax work" (Masaitis Aff. ¶ 20). When Masaitis heard that plaintiff had pulled out of the Business Tax Services project on February 6, 2020, he contacted the M&A Tax Human Resources Business Advisor saying that this behavior, in his opinion, warranted a Low Performance Memorandum ("LPM") (*see id.* ¶ 21). "The purpose of the LPM is to identify in writing those areas where an employee's performance is falling short and recommend how to improve" (Memo at 7). This matter was referred to defendant Czerwinski in Human Resources, who worked with Ziegler to monitor plaintiff's progress from February through April 2020 (*see* Czerwinski Aff. [NYSCEF Doc. No. 73] ¶¶ 3, 5).

## II.     Low Performance Memorandum

Sometime in April 2020,[1] a virtual meeting was conducted in connection with the midyear, or "Interim" assessments of employees at and below plaintiff's level in M&A Tax (Memo at 6). These assessment meetings are routine (*see id.*). At this time plaintiff's year-to-date Utilization was still 29% while the target was 70% and he was the lowest-utilized Senior Associate in M&A Tax at NYMetro (*see* Masaitis Aff. ¶ 27; Ziegler Aff. ¶ 7; *see also* Ex. 13 to

---

[1] Defendant Masaitis describes the date of this meeting as April 21, 2020, in his affidavit, while defendant Czerwinski says it occurred on April 23 of that year in hers (*see* Masaitis Aff. ¶ 25; Czerwinski Aff. ¶ 6). Plaintiff in his affidavit states the meting occurred "in April 2020" (Plaintiff Aff. [NYSCEF Doc. No. 110] ¶ 18).

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 4 of 27

Lin Aff.). Plaintiff believes this metric is false (*see* Compl. ¶ 45). Defendants Masaitis, Ziegler, and Czerwinski, as well as nonparty Megan Charles, attended this virtual interim assessment meeting (*see* Czerwinski Aff. ¶ 6). Masaitis attested that at this meeting, the attendees discussed that plaintiff's "extremely low Utilization was unacceptable for an experienced Senior Associate. He should have been in high demand if M&A Tax professionals thought he had skills and abilities to assist" (Masaitis Aff. ¶ 28).

The consensus following the virtual meeting was that plaintiff as well as three others were to be identified as low performers (*see id.* ¶ 28; Czerwinski Aff. ¶ 7). When an employee is designated as a low performer, a LPM is prepared for the employee to understand where he or she has been deficient in his or her performance and recommended steps to improve (*see* Czerwinski Aff. ¶¶ 6-7). Consequently, a LPM was prepared for plaintiff (*see id.*). Czerwinski provided Ziegler with a template LPM as it was Ziegler's responsibility to prepare plaintiff's LPM (*see* Ziegler Aff. ¶ 8). Ziegler was to "identify performance areas where Boris had weaknesses and provide guidance on how he could improve" (*id.*). While creating plaintiff's LPM, Ziegler spoke to several Partners and Managing Directors who had supervised plaintiff on various projects (*see id.* ¶¶ 8-11). Partners and Managing Directors can give employees engagement reviews, called 'GPS's,' to "provide feedback on how an employee has done on a particular project" (*id.* ¶ 8). The GPS's reviewed by Ziegler ranged from "mediocre" to more positive and favorable, but speaking with the partners who supervised plaintiff on Tax-related projects revealed they had concerns about his performance (*id.* ¶¶ 8-10). Using his "own experiences with Boris, as well as the feedback [he] received from others," Ziegler prepared plaintiff's LPM (*id.* ¶ 12). Czerwinski reviewed the LPM and it was ultimately reviewed and approved by her superior, Cynthia Carranza (*see* Czerwinski Aff. ¶ 8).

The LPM was delivered to plaintiff in a call held on May 26, 2020, where defendants Ziegler and Czerwinski were also present (*see id.* ¶ 9). The LPM informed plaintiff that his Impact Metric (one of the ways KPMG measures employee performance) for the fiscal year to date "was 57% as compared to the target for senior associates in M&A tax of 80%" (Low Performance Memorandum, Ex. 1 to Czerwinski Aff. [NYSCEF Doc. No. 74]). Despite his low Utilization, the LPM indicated that plaintiff had "turned down opportunities to work with other practices within the tax practice" (*id.*). The LPM indicated some action steps plaintiff was recommended to take to remedy his deficient performance and increase his chargeable hours to "at least 70%" (*id.*). Czerwinski attested that plaintiff "was very unhappy" with the LPM and "indicated that he intended to appeal it," so she let her superior know that an Ethics and Compliance investigation would likely occur (*id.* ¶ 10).

Beginning in April and into June and July, plaintiff was working on a project for Bank of America that did not involve M&A work and did not involve Tax work (*see* Memo at 8; Masaitis Aff. ¶ 38). From a conversation he had with defendant Tonya Christianson, plaintiff was aware that although it boosted his chargeable hours, it did not help his utilization because "his evaluation is based on his work in M&A and we should not bring [the Bank of America project] into the discussion" (Ex. 9 to Masaitis Aff. [NYSCEF Doc. No. 78]).

### III.     Ethics & Compliance Investigation and Year-End Evaluation

Because their work schedule follows the fiscal year, KPMG employees prepare year-end evaluations beginning in July (*see* Memo at 8). Around this time, the appeal from plaintiff's LPM was being investigated by the Ethics & Compliance group, which is "an internal team responsible for investigating complaints" (*id.* at 7). Joshua Ellis, an attorney, led the investigation and it was pending at the time the process of year-end evaluations was due to start

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No.  005

[* 6]

(*see id.* at 7-8). Defendant Lena Haidysh, the employee who took over handling plaintiff's Human Resources issues after Lara Czerwinski went on maternity leave, consulted with Ellis regarding the investigation (*see* Memo at 8; Ex. J to Abrams Aff. at 50). She then told Scott Novick, plaintiff's new People Management Leader, not to conduct a year-end evaluation for plaintiff (*see id.*). The outcome of the Ethics & Compliance investigation into the issuance of plaintiff's LPM "would be dispositive of his Year-End rating" (Memo at 8).

In September 2020 the Ethics & Compliance investigation was completed and a report was issued (*see* Memo at 9; Ex. B to Abrams Aff. [NYSCEF Doc. No. 72]). The investigation "determined that [plaintiff's] allegations were unsubstantiated" (Ex. B to Abrams Aff. at 9). Accordingly, the LPM stood and could be used in completing plaintiff's end-of-year evaluation (*see* Memo at 9). This decision was explained in a "FY20 Low Performance Justification Memo" written and issued by Haidysh that stated, "Given the investigative findings, the decision was made that no further action would be taken and the LPM will remain in place" (Memo at 9-10; Ex. C to Abrams Aff.).

### IV. KPMG's Reduction-in-Force

In July 2020, it was reported to the directors at the M&A Tax division that because of the pandemic, KPMG leadership was planning to undertake a "major reduction in force" ("RIF") across all practice areas (Masaitis Aff. ¶ 33). Specifically, M&A Tax was directed to reduce costs by $11,000,000 (*see id.*). M&A Tax was given criteria by Human Resources for termination of employees in the RIF which included "(a) anyone designated as a Low Performer; (b) elimination of whole sub-groups within a practice; or (c) anyone with high compensation relative to their contribution to the business" (Memo at 9).

150640/2021 POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 7 of 27

7 of 27

Defendant Masaitis attested that in M&A Tax, four individuals were identified as Low Performers and as such, "automatically went on the RIF list" as they met a criterion given by Human Resources (Masaitis Aff. ¶ 35). On August 14, 2020, M&A Tax provided the first draft of its RIF list to Human Resources (*see id.* ¶ 37). Plaintiff was included on this list because he was a Low Performer, but Masaitis attested that he also could have been included under criteria (c) because "his salary was very high compared to his contribution in the form of chargeable work performed and did not meet any of the expectations" (*id.*). Plaintiff was terminated in the RIF on October 16, 2020 (*see id.* ¶ 40). He was one of about 1,400 employees terminated in the RIF (*see id.*).

## SUMMARY JUDGMENT STANDARD

"[T]he proponent of a motion for summary judgment must demonstrate that there are no material issues of fact in dispute, and that it is entitled to judgment as a matter of law" (*Ostrov v Rozbruch*, 91 AD3d 147, 152 [1st Dept 2012]). "Failure to make such prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986] [internal citations omitted]). Once a movant has met this burden, "the burden shifts to the opposing party to submit proof in admissible form sufficient to create a question of fact requiring a trial" (*Kershaw v Hospital for Special Surgery*, 114 AD3d 75, 82 [1st Dept 2013]). "[I]t is insufficient to merely set forth averments of factual or legal conclusions" (*Genger v Genger*, 123 AD3d 445, 447 [1st Dept 2014], quoting *Schiraldi v U.S. Min. Prods.*, 194 AD2d 482, 483 [1st Dept 1993]). Finally, evidence must be "construed in the light most favorable to the one moved against" (*Kershaw*, 114 AD3d at 82). Therefore, if there is any doubt as to the existence of a triable fact, the motion for summary judgment must be denied (*Rotuba Extruders v Ceppos*, 46 NY2d 223, 231 [1978]).

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 8 of 27

[* 8]

## PROCEDURAL HISTORY

Plaintiff sued KPMG LLP as well as seven individual defendants who were employed at KPMG. The complaint contained causes of action for defamation, discrimination, and retaliation. The defendants filed a motion to dismiss pursuant to CPLR 3211(a)(7) where the court dismissed several statements from plaintiff's defamation cause of action that the court found to not be defamatory but otherwise did not dismiss the complaint. Defendants now bring this motion under CPLR 3212 seeking dismissal of the remainder of plaintiff's claims.

## DISCUSSION

### I.    Plaintiff's Defamation Claims

To prevail on a claim of defamation, a plaintiff must show: "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm" unless the statement is a type that is actionable regardless of harm under the law (*Stepanov v Dow Jones & Co., Inc.*, 120 AD3d 28, 34 [1st Dept 2014]; *see also Dillon v City of New York*, 261 AD2d 34, 38 [1st Dept 1999]). Defamatory statements must be pled with specificity as is required by CPLR 3016 (a). The plaintiff must state "the particular words complained of" as well as "the time, place, and manner of the false statement and specify to whom it was made" (*Dillon*, 261 AD2d at 38 [internal quotations omitted]).

Defamatory statements can be either *per se* or *per quod*. "Where the defamatory statement is [defamatory] *per se* the plaintiff can recover damages without pleading and proving 'special harm,'" but if the statement is defamatory "*per quod*, the plaintiff can only recover damages if [he] pleads and proves such harm" (*Ava v NYP Holdings, Inc.*, 64 AD3d 407, 412 n. 3 [1st Dept 2009] [internal citations omitted]). If a plaintiff fails to show that the defamatory statements fall into one of the four categories of defamation *per se*, he must prove special

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 9 of 27

9 of 27

[* 9]

damages (*see Nolan v State*, 158 AD3d 186, 195 [1st Dept 2018]). One such category of statements that can be defamatory *per se* are those that "tend[] to injure another in his trade, business, or profession" (*Davydov v Youssefi*, 205 AD3d 881, 882 [2d Dept 2022]).

Defamatory statements are false statements of fact in which "there is no constitutional value" (*Rinaldi v Holt, Rinehart & Winston*, 42 NY2d 369, 380 [1977]). As such, truth "provides a complete defense to defamation claims" (*Dillon*, 261 AD2d at 39). The plaintiff bears the burden of establishing the falsity of the statement (*Rinaldi*, 42 NY2d at 379-80). Similarly, expressions of pure opinion are not defamatory under the law and are deemed privileged, "no matter how offensive" the statement (*Bacon v Nygard*, 189 AD3d 530, 530 [1st Dept 2020]; *Stega v New York Downtown Hosp.*, 31 NY3d 661, 674 [2018]). However, "an opinion that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it . . . is a mixed opinion" and is actionable as defamation (*Bacon*, 189 AD3d at 530 [internal citations and quotations omitted]). Distinguishing between statements of fact and opinion is a question of law for the courts, and the "dispositive inquiry" is whether a reasonable person could have concluded that the statement at issue was "conveying facts about the plaintiff" (*id.* at 530-531 [quoting *Gross v New York Times Co.*, 82 NY2d 146, 152 (1993)]).

An essential element of a defamation claim is that the statement was published to a third party (*see Stepanov*, 120 AD3d at 34). "Publication" requires communication of the statement to someone other than the plaintiff himself (*see Gaccione v Scarpinato*, 137 AD3d 857, 858 [2d Dept 2016]). A claim of defamation will fail if the plaintiff fails to allege that the statements were made to a third party (*Richards v Security Resources*, 187 AD3d 452, 453 [1st Dept 2020]).

"[A]n employer has the right, without judicial interference, to assess an employee's performance on the job" (*Williams v Varig Brazilian Airlines*, 169 AD2d 434, 438 [1st Dept

[* 10]

1991]). This right is based on the common interest privilege, a qualified privilege that protects communications "made by one person to another upon a subject in which both have an interest" (*id.*; *see also Richards*, 187 AD3d at 453). Accordingly, internal employment reviews can be protected speech and not defamatory either as an expression of opinion or because of this common interest privilege (*see Dillon*, 261 AD2d at 38). Memoranda regarding employee performance have routinely been upheld as non-defamatory expressions of opinion (*see, e.g., Williams*, 169 AD2d at 438; *Panghat v New York Downtown Hosp.*, 85 AD3d 473, 474 [1st Dept 2011]; *Falk v Anesthesia Assoc. of Jamaica*, 228 AD2d 326, 328 [1st Dept 1996]; *Sanderson v Bellevue Maternity Hosp.*, 259 AD2d 888, 889-90 [3d Dept 1999]).

Plaintiff claimed several statements with varying levels of specificity in paragraphs 92-114 of his Amended Complaint that he alleges constitute defamation. Prior to this summary judgment motion, defendants filed a motion to dismiss under CPLR 3211(a)(7). At oral arguments held on March 31 and June 8, 2022, the court dismissed several individual statements as not defamatory (*see generally* Ex. L and Ex. M to Abrams Aff.). Each remaining statement pled with enough specificity is not defamatory based on truth, opinion, lack of publication, or privilege and accordingly, defendants are entitled to summary judgment dismissing plaintiff's defamation claims.

**Specific defamatory statements**

*"Damaged our reputation with client"* (Compl. ¶ 101)

Plaintiff alleged that defendant Lin and nonparty Ellis made this statement "to one of KPMG's clients" (Compl. ¶ 101(i)). Defendants argue that there is no evidence that such a statement was ever made to a client or any other third party, and even so, plaintiff did not specify to whom the statement was made as is required under CPLR 3016 (*see* Memo at 12-14).

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 11 of 27

11 of 27

Defendants further argue that the statement comes from the Investigation Report and the Justification Memo, wherein the statement is put into further context: by accepting and then withdrawing from a project, plaintiff, according to a witness, "damaged the Firm's reputation with the client" (*id.* at 16; Ex. C to Abrams Aff.). Defendants argue that this was an opinion based on facts communicated to the recipient of the statement in the very sentence, and thus is not defamatory (*see* Memo at 16).

In opposition, plaintiff argues that the defendants did not "give a single example of how Plaintiff purportedly damaged the firm's reputation" and moreover, defendants Lin and Haidysh could not recall making and/or recording this statement (Opp. at 3-5). Plaintiff argues this warrants an "adverse credibility finding" (Opp. at 4). Plaintiff further argues that the qualified privilege does not apply because a client is a third party without a common interest in plaintiff's performance but has failed to specify the third party at any stage of this litigation.

Even an adverse credibility finding would not overcome the fact that the plaintiff bore the original burden of proving that the statement was communicated to any client or anyone outside KPMG, and this required level of specificity is not met in the Amended Complaint (*see Richards*, 187 AD3d at 453). At the summary judgment stage, defendants showed that the statement was made in two internal memoranda seen only by KPMG employees who share a common interest in plaintiff's work product and performance (Memo at 13-14). Met once again with an opportunity to show communication to parties outside KPMG, plaintiff did not provide evidence sufficient to refute the contention that the statement was not made to anyone outside KPMG.

*Providing work product that is not "well thought-out, reviewed from a tax technical and critical thinking standpoint"* (Compl. ¶ 105)

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No.  005

Page 12 of 27

12 of 27

Defendants argue that this statement is a non-defamatory expression of opinion regarding plaintiff's performance (*see* Memo at 16). In opposition, plaintiff argues that his "excellent reviews that support him for manager, coupled with the investigator's determination that there were no performance issues, more than raises a triable issue of fact" (Opp. at 7).

In their reply, defendants note that this statement is found in the LPM under a heading entitled "Action steps for performance development" (Ex. 1 to Czerwinski Aff.; Reply [NYSCEF Doc. No. 151] at 4). Defendants argue that directions to the employee and suggestions to improve their performance are opinion and are not defamatory (*see* Reply at 4). Defendants cite *Locke v Aston*, in which the First Department dismissed a plaintiff's cause of action for defamation because "defendant's statements that plaintiff did 'substandard' work and the manuscript was 'not up to standard' are constitutionally protected opinion" (*Locke v Aston*, 1 AD3d 160, 160 [1st Dept 2003]).

Defendants are correct in their argument that directives to employees are not defamatory. Not only were they stated in an internal memorandum seen only by those with an interest in plaintiff's performance, but these suggestions to improve performance within such a memorandum are opinion and are not actionable (*see Williams*, 169 AD2d 434; *Panghat*, 85 AD3d at 474).

*Not having "awareness and control of all the facts on a given project"* (Compl. ¶ 106A)

Defendants similarly argue that this statement, found in the LPM, is an opinion about the employee's performance and a directive to the employee and is not defamatory (*see* Memo at 16; Reply at 4). Defendants' argument is correct for the reasons stated above and this statement is not defamatory.

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 13 of 27

[* 13]

*Plaintiff did not always follow up on assignments, delegated a lot to associates, and did not take ownership* (Compl. ¶ 114)

Defendants argue that this is another example of protected opinion about an employee's performance (*see* Memo at 16). Moreover, this statement was made in the internal investigation report. Plaintiff does not mention this statement in his opposition. For the reasons stated above, defendants are correct in their argument that this is opinion about plaintiff's performance and, even if not, such statement is protected by the common interest privilege.

*"Boris has struggled in various performance areas including time management, technical, delegation, and engagement management skills"* (Compl. ¶ 107)

Defendants argue that this statement is an opinion by an employer regarding an employee's performance and was made in an internal memorandum (*see* Memo at 16). In opposition, plaintiff argues that the statement is false and, in any event, defendant Haidysh "admits to not making any efforts to verify this statement" (Opp. at 7). However, as this statement is an expression of opinion about plaintiff's performance there are no facts that Haidysh was required to "verify." Moreover, the statement was made in the Justification Memo, a memorandum prepared specifically for plaintiff, and there is no evidence that this statement was published to anyone outside of M&A Tax or Human Resources at KPMG who lacked a common interest.

*Plaintiff "charg[ed] more hours than the associates"* (Compl. ¶ 100)

Defendants argue that this statement does not constitute defamation because Ziegler made this statement directly to plaintiff, and plaintiff never met his burden of proving that this statement was made to a third party (*see* Memo at 13). In opposition, plaintiff speculates that this statement "imputes fraud onto the Plaintiff" because the Ethics & Compliance committee

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 14 of 27

investigated it for "Improper charging of time" even though, according to plaintiff, Ziegler

charged more hours than plaintiff himself (Opp. at 7-8). In refuting the argument plaintiff poses

in his Opposition, defendants note that this language of "improper charging of time" was in a

statement made by plaintiff himself about Ziegler, and plaintiff was not the one investigated for

"improper charging of time" (Reply at 5). Defendants also note that the Court previously found

this statement to not be defamatory at the motion to dismiss stage and dismissed the plaintiff's

argument that the statement "imputed fraud" on him (Memo at 13 n. 5).

Even assuming *arguendo* that this statement was not dismissed at the CPLR 3211 stage,

this statement can be dismissed at the summary judgment stage. Defendants correctly argue that

plaintiff never sufficiently showed that the statement was made to anyone other than the plaintiff

himself. Plaintiff therefore never met the publication requirement to sufficiently support a claim

of defamation.

*Plaintiff's "low impact metric" and low Utilization* (Compl. ¶ 93)

Defendants argue that this statement is not defamatory because it was true. Defendants

argue that the language came from the LPM, which states,

> Your FY20 Impact Metric through February 29, 2020 was 29.1% as
> compared to your peers in the [Business Unit] which is 58.3% on average.
> Despite your low Impact Metric, you have turned down opportunities to
> work with other practices within the tax practice.

Ex. 1 to Czerwinski Aff. [NYSCEF Doc. No. 74].

Although the burden is on the plaintiff to prove the falsity of the statement, defendants

proffer a Utilization spreadsheet for the month of February depicting the Utilization of each

M&A Tax Senior Associate to bolster its argument that the statement is true. In this spreadsheet,

plaintiff's Utilization was the second lowest on the list of 113 Senior Associates at 29.1% (*see*

Ex. 12 to Lin Aff. [NYSCEF Doc. No. 79]).

150640/2021  POGIL, BORIS vs. KPMG, LLP                                Page 15 of 27
Motion No. 005

15 of 27

In opposition, plaintiff argues that he should have been judged on Impact Metric and not Utilization alone (*see* Opp. at 9). He also argues that defendants pursued a "fake Low Performance memorandum" despite plaintiff's high impact metric and Utilization (*id.*). Moreover, plaintiff argues that Human Resources had said there was "nothing in his current file" that "indicates that there is an issue with his work product," which is consistent with the fact that his utilization for the month of February alone was 90% (*id.*).

Plaintiff's arguments in opposition are to no avail. First, as defendants correctly note in their reply, even if the management focused on the wrong metric, it is irrelevant because the comments at issue were "about Utilization, and they were true" (Reply at 6). Next, although plaintiff is correct that his Utilization was 90% for the month of February, the statement specifically explains that the 29.1% figure is his Utilization for the fiscal year-to-date. As such, even though plaintiff had improved his Utilization during the month of February, the calculations that his fiscal year-to-date Utilization was the second lowest among senior associates in M&A Tax were true at the time the statement was made and is therefore not defamatory. Finally, it is worth noting that an employee's Utilization relates to time spent on a project, and the quality of his or her work product is not a relevant factor when calculating Utilization.

*Plaintiff had 57 late or missing timesheets as of April 30, 2020* (Compl. ¶ 102)

Defendants argue that this statement was true because it was based on KPMG's records at the time (*see* Memo at 15). Further, the statement was made in the LPM which was delivered to plaintiff and falls inside the common interest privilege.

Plaintiff does not refute this in his opposition by arguing its falsity. As such, the statement is not defamatory and is dismissed.

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 16 of 27

16 of 27

*Ziegler's statements to plaintiff to "communicate and discuss all offers for new work, and do not decline any opportunities before speaking with your management group to see if work can be accommodated"* (Compl. ¶ 103) *and Ziegler's statement to plaintiff that "you need to work towards better daily scheduling management and time management so you can respond to supervisor requests more quickly and you should avoid referring your supervisors to the staff person you are working with on the project"* (Compl ¶ 104)

Defendants argue that these are not "statements" that are subject to a claim of defamation (Memo at 12 n. 4). These communications are instructions about improving plaintiff's performance and were found in the LPM directed to plaintiff. Plaintiff does not argue otherwise in his opposition. For the reasons stated above, defendants are correct that instructions to an employee to improve performance such as these are not defamatory.

For the foregoing reasons, each individual statement pled with sufficient specificity is not defamatory or is not actionable as defamatory because of privilege and each must be dismissed.

**Plaintiff's other defamation arguments**

When a defendant argues that a statement falls under the common interest privilege, such privilege "may be dissolved if plaintiff can demonstrate that defendant spoke with malice" (*Liberman v Gelstein*, 80 NY2d 429, 437 [1992]). "Actual malice is not supported" if allegations of such malice "rest solely on surmise and conjecture" (*Dillon*, 261 AD2d at 40). Common law malice can be proven by a showing of "spite or ill will" while the standard for constitutional malice is "reckless disregard for the truth" (*Liberman*, 80 NY2d at 434, 438 ["[W]e have recognized that the constitutional as well as the common-law standard will suffice to defeat a conditional privilege"]). Plaintiff has shown neither. His only arguments in his opposition are "examples" that "Ziegler admitted that his Low performance memorandum was 'hard to piece

**150640/2021 POGIL, BORIS vs. KPMG, LLP**
**Motion No. 005**

**Page 17 of 27**

17 of 27

together'" and that "Defendants refused to withdraw the Low Performance memorandum even though Human Resources said it should never be issued" (Opp. at 10-11). These arguments amount to conjecture and do not prove at all that defendants acted with ill will or with reckless disregard of the falsity of a statement. Moreover, defendants showed that many of the statements were either true or were made with the intention of providing suggestions for plaintiff's improvement. As plaintiff cannot prove malice in either form, the common-interest privilege applies.

Next, because none of the statements are actionable, the argument about special damages need not be discussed. Even if plaintiff had adequately shown that a statement constituted defamation, he failed to prove defamation *per se* because he could not establish that any of the statements fell within any of the four categories of defamation *per se*. As such, he would need to plead special damages to prove defamation *per quod*. In his opposition plaintiff argues that he suffered "mental anguish" which can constitute special damages (Opp. at 12-13). Plaintiff cites *Nolan v State of New York*, which, as defendants point out in their reply, does not support plaintiff's position that intangible emotional distress can cause special damages (158 AD3d 186 [1st Dept 2018]). The First Department in *Nolan* held that the Supreme Court erred in failing to dismiss plaintiff's defamation claim when "she only suffered intangible damage in the form of emotional distress" and thus was not able to "sustain her general defamation claim, which requires allegations of special damages" (*id.* at 191). Plaintiff's failure to prove actual damages as a result of the allegedly defamatory statements requires dismissal.

On the basis of the foregoing, defendant's motion for summary judgment dismissing plaintiff's defamation claims is granted as alleged against all defendants.

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 18 of 27

[* 18]

## II.     Plaintiff's Discrimination Claims

Plaintiff claims he was unlawfully discriminated against for his gender and caregiver status pursuant to the New York City Human Rights Law (Admin. Code of the City of NY, §§ 8-107 [1] [a]; [7]) (NYCHRL) and the New York State Human Rights Law (Exec. Law §§ 296 [1]; [7]) (NYSHRL). Under the NYCHRL and NYSHRL, discrimination claims are evaluated under the standard set forth in the US Supreme Court case *McDonnell Douglas Corp. v Green* (411 US 792 [1973]).[2] Under this framework, a plaintiff alleging employment discrimination bears the initial burden of proving a *prima facie* case of discrimination. To meet this burden, the plaintiff must establish that: (1) he is a member of a protected class; (2) he was qualified to hold the position; (3) he was terminated or suffered an adverse employment action; and (4) "the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination" (*Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 305 [2004]; *Melman v Montefiore Medical Center*, 98 AD3d 107, 113-14 [1st Dept 2012]). If that is met, the burden then shifts to the employer who must rebut the presumption of discrimination by "clearly setting forth, through the introduction of admissible evidence, legitimate, independent, and nondiscriminatory reasons to support its employment decision" (*Ferrante v American Lung Assn.*, 90 NY2d 623, 629 [1997]; *Melman*, 98 AD3d at 115). Finally, the burden shifts back to the plaintiff to prove that the reasons given by the defendant "were merely a pretext for discrimination by demonstrating both that the stated reasons were false and that discrimination was the real reason" (*Forrest*, 3 NY3d at 305).

---

[2] As will be explained *infra*, to be awarded summary judgment under the City Human Rights Law, the defendant bears the burden of showing that no jury could reasonably find the defendant liable under the *McDonnell Douglas* standard *or* the newer "mixed-motive" framework (*Bennett v Health Mgmt. Systems, Inc.*, 92 AD3d 29, 41 [1st Dept 2011]).

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 19 of 27

Defendants argue that plaintiff has not made a *prima facie* showing because he "has no competent evidence that Defendants discriminated against him because he is male or because he has a child" (Memo at 19). Plaintiff, in opposition, argues that he has raised an "inference of discrimination" by demonstrating that he was treated less favorably than other similarly situated employees (Opp. at 14). Plaintiff offers examples of "similarly situated" female employees at KPMG with childcare responsibilities. For such examples to support a *prima facie* case of discrimination, the other employees must be "similarly situated in all material respects" (*Shah v Wilco Systems*, 27 AD3d 169, 177 [1st Dept 2005] [internal quotation marks omitted]). Moreover, "[w]hile their circumstances do not have to be identical, there should be a reasonably close resemblance of facts and circumstances" (*id.* [internal quotation marks omitted]).

In his Amended Complaint, plaintiff alleges that similarly situated women at KPMG were treated more favorably than him because they "were not issued Low Performance evaluations" and "did not have their performance judged on utilization" (Compl. ¶¶ 127-28). In further support of this contention, plaintiff states in his opposition that these women were similarly situated to plaintiff because "they are all staff in Plaintiff's M&A practice" and "are subject to the same workplace standards, same review period, same promotion standards, same disciplinary procedures, and share common supervision" (Opp. at 17).

First, plaintiff compares himself to fellow employees Nellie Cohen and Angela Norton. However, as defendants point out, they were both Managers, not Senior Associates, and were not sufficiently "similarly situated" because their job titles and roles differed (*see Shah*, 27 AD3d at 177 [rejecting plaintiff's argument that he, a Junior Systems Administrator, and his supervisor, a Systems Administrator, were similarly situated because their "roles and responsibilities differed"]; *see also Herskowitz v State*, 2023 WL 8939015 at *3 [1st Dept Dec. 28, 2023]

**150640/2021  POGIL, BORIS vs. KPMG, LLP**                              **Page 20 of 27**
**Motion No. 005**

[finding plaintiff and another employee were not similarly situated because they "had different job titles and duties"]). Moreover, Utilization is a metric used for Senior Associates, but not employees at the management level (*see* Reply at 13). Even if they were similarly situated in their roles at KPMG, defendants argue that Ms. Cohen was terminated in the RIF just like plaintiff, so he fails to show disparate treatment (*see* Memo at 21). Defendants further argue that Ms. Norton was employed not by US-based KPMG LLP, but KPMG Australia, and was on a one-year rotation in the United States, which make her and plaintiff's situations incomparable (*see id.*). Because plaintiff did not establish that he was similarly situated to Ms. Cohen and Ms. Norton "in all material respects," comparing his treatment to theirs does not raise an inference of discrimination (*Shah*, 27 AD3d at 177).

Plaintiff also compares himself to Senior Associates Choyce Garcia and Tess Tomasello. Plaintiff argues that Ms. Tomasello "was given a reduced workload arrangement, and Ziegler admitted that he did not judge her on utilization even though she was 19% utilized" (Opp. at 18). Defendants note in response that Ms. Tomasello was on a leave of absence from May 2019 through July 2020. Because she was not working, she could not perform chargeable work and had no Utilization goal to meet (*see* Memo at 21). Since plaintiff was working and had a Utilization goal to meet during this time period, he and Ms. Tomasello were not similarly situated. Plaintiff argues that Ms. Garcia was treated differently because she was "not being judged on low utilization due to childcare, whereas Plaintiff was issued a Low Performance Memorandum because he did not relocate to San Francisco [and] used the COVID-19 charge code due to childcare" (Opp. at 17). Defendants argue that Ms. Garcia's pre-pandemic Utilization was 55% as of February 29, 2020, while plaintiff's Utilization was at 29% (Reply at 12; Ex. 12 to Lin Aff.). Even if Ms. Garcia had low utilization during the pandemic due to

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 21 of 27

[* 21]

childcare responsibilities, her Utilization was nearly twice plaintiff's in the pre-pandemic period and did not warrant a LPM. The July 2020 RIF was based on performance and utilization factors from this pre-pandemic period and "Utilization in July 2020 had nothing to do with Plaintiff's inclusion in the RIF" (Reply at 12). Accordingly, plaintiff and Ms. Garcia are not similarly situated.

The evidence proffered by plaintiff to establish that he was discriminated against does not give rise to an "inference of discrimination" because plaintiff could not show any employees under materially similar circumstances who were treated more favorably than plaintiff. As such, plaintiff did not make out a *prima facie* case of discrimination under the *McDonnell-Douglas* standard.

Even assuming plaintiff did meet his burden, defendants offer legitimate, nondiscriminatory reasons for terminating plaintiff's employment in the RIF. Defendants argue that plaintiff had been designated as a Low Performer based on his Utilization and his performance (*see id.*). Plaintiff should have had a high Utilization compared to Senior Associates but instead was often the lowest or second lowest. "Despite this, he refused assignments that would have allowed him to significantly increase his Utilization. Worse, after committing to take on whatever work was assigned, and specifically committing to the BTS project in February, Plaintiff reneged" (*id.* at 19-20). Plaintiff, as a recipient of a LPM in the relevant time period, fell into one of the categories of employees designated by KPMG's Human Resources department (and none of the individual defendants) as eligible to be terminated in the RIF. He was one of 1400 employees who were terminated in this RIF (*id.* at 20). "There is no question that a reduction in force undertaken for economic reasons is a nondiscriminatory basis for employment terminations" (*Hudson v Merrill Lynch & Co., Inc.*, 138 AD3d 511, 515 [1st Dept 2016]).

150640/2021 POGIL, BORIS vs. KPMG, LLP Page 22 of 27
Motion No. 005

22 of 27

Defendants submitted sufficient evidence showing that plaintiff was included in the RIF because of his low utilization and otherwise poor performance (*see id.* at 515-16 [finding that plaintiff's inclusion in a reduction in force was nondiscriminatory, even more so when defendants submitted evidence that plaintiff's performance was weakest among those with the same position and employed for the same amount of time]). By showing that plaintiff was included in a company-wide RIF based on his low pre-pandemic utilization, defendants met their burden of showing a legitimate and nondiscriminatory reason for plaintiff's termination (*see* Masaitis Aff. ¶¶ 34, 37; Ex. 10 to Masaitis Aff. [NYSCEF Doc. No. 78]).

Finally, the burden shifts back to plaintiff to show that the reasons proffered by the defendant are pretextual and the termination was in fact based on discriminatory factors due to his gender and parental status. Under the "mixed-motive" framework that is appropriate for claims under the NYCHRL, the standard at this stage is somewhat different (*Melman v Montefiore Medical Center*, 98 AD3d 107, 113 [1st Dept 2012]). Plaintiff need only show that triable issues of fact exist that discrimination was *one of* the motivating factors of plaintiff's termination (*see Williams v New York City Hous. Auth.*, 61 AD3d 62, 78 n. 27 [1st Dept 2009]). There must be no genuine dispute of material fact under both the mixed-motive framework and the *McDonnell Douglas* framework to warrant summary judgment under the NYCHRL.

Plaintiff argues that there is an issue of fact as to defendants' defense of a legitimate business decision because at one point, defendants state the reason plaintiff was terminated was due to "material downturn in KPMG's business," while in another document, cited as Plaintiff's Exhibit 44, it is noted that "Overall billable hours and net sales increased" (Opp. at 23). In response, defendants argue that plaintiff's opinion that a reduction in force was unnecessary fails to establish a triable issue of fact, citing *Alvarado v Hotel Salisbury, Inc.* (38 AD3d 398 [1st

150640/2021 POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 23 of 27

23 of 27

[* 23]

Dept 2007] [holding that plaintiff's argument that defendants' decision to have a RIF was "contrary to sound business or economic policy" was insufficient to establish pretext]). Defendants also note that the exhibit referenced by Plaintiff was from KPMG International, while the former came from KPMG LLP, and both are "legally distinct and separate" entities (Reply at 9). Consequently, showing that one such entity was having economic growth does not mean the same for another KPMG entity. With this argument plaintiff did not meet his burden of establishing pretext or creating an issue of fact as to defendants' cited nondiscriminatory reasons for the termination.

Another of plaintiff's arguments in an attempt to show pretext is that the defendants were punishing him for his use of the COVID-19 charge code, a time code where employees could "bill time they could not work because of pandemic-related issues," including childcare necessitated by school closure or illness (Memo at 6). Plaintiff argues that "[t]here is no evidence that any of the women were penalized for using the COVID charge code due to family obligations" (Opp. at 18). Plaintiff's evidence that the defendants "had a problem" with plaintiff's use of the charge code was Haidysh's statement that "We could potentially retain Boris on [the Bank of America project] on a month-to-month basis. If we compel him to return to M&A, I could see him ending up using COVID time code and not being productive on his core work anyway" (Reply at 14; Opp. at 18). Plaintiff essentially asks the court construe this statement as defendants "penalizing" plaintiff for using the charge code. Defendants argue that Haidysh was simply opining to E&C investigator Ellis, based on plaintiff's previous performance, that "even if they required him to take on M&A work, he might not end up doing it anyway, so they may as well leave him on BOA" (Reply at 14-15).

Plaintiff also offers evidence of an email conversation where plaintiff notified defendant Novick that he wanted to continue working on the Bank of America project instead of an M&A project because it was more flexible with time than the M&A project. Czerwinski said to Novick that "we might want to accommodate this COVID-based accommodation request, especially if M&A work remains low" (*id.* at 19). In response, Novick notified Czerwinski that he would "really like to discuss with [her]" (*id.*). Plaintiff attempts to argue that Novick "really want[ing] to discuss" plaintiff's accommodation situation with Czerwinski is evidence of the fact that "Novick and KPMG had a serious problem with Plaintiff using the COVID charge code due to childcare responsibilities" (*id.* at 20). Plaintiff's arguments that these statements show that he was terminated for his use of the charge code due to his childcare responsibilities are huge leaps of logic that do not create a sufficient issue of fact nor demonstrate pretext.

Finally, plaintiff argues that he was the only employee who did not receive a year-end evaluation. Plaintiff argues that the Ethics & Compliance investigation into his LPM was "purposefully ended two days after the year-end evaluations took place" so that plaintiff would not be evaluated on his year-end performance and only on the interim assessment (Opp. at 21). Plaintiff offers no evidence of this besides mere speculation and evidence of Ellis's deposition testimony that he "do[es]n't recall" what specific investigative steps were taken in July, August, or September (*id.* at 22). These reasons are similarly leaps of logic and are not evidence sufficient to raise a question of fact. Plaintiff offers no evidence that he was the only person not to receive a year-end evaluation nor that the investigation report was held up specifically to prevent plaintiff from receiving one. Moreover, the year-end evaluation or lack thereof was immaterial to plaintiff's termination because, as previously mentioned, the interim assessments

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No.  005

Page 25 of 27

25 of 27

(from which came plaintiff's LPM) were the assessments used to help decide who was terminated in the RIF.

Plaintiff did not provide evidence to demonstrate that there are triable issues of fact that the reasons proffered by defendants were pretextual or even that the decision to terminate plaintiff was partially motivated by gender and/or childcare status discrimination. As such, defendants have met their burden for summary judgment on plaintiff's discrimination claims.

### III.    Plaintiff's Retaliation Claims

Finally, plaintiff raises a cause of action for retaliation. Plaintiff does not state any action that would have led to termination due to retaliation. To make out a claim for retaliation under the NYCHRL, a plaintiff must show that

> (1) []he has engaged in protected activity, (2) [his] employer was aware that []he participated in such activity, (3) []he suffered an adverse employment action based upon [his] activity, and (4) there is a causal connection between the protected activity and the adverse action.

*Forrest*, 3 NY3 at 313.

Defendants argue that plaintiff cannot show retaliation as he did not engage in a "protected activity" and there is no evidence that defendants took any action against him as a result of a protected activity (Memo at 23). Defendants argue that the only complaint plaintiff made was to challenge his LPM, which he did not assert he received due to any protected characteristics. "Filing a grievance complaining of conduct other than unlawful discrimination is not a protected activity subject to a retaliation claim" under either the NYCHRL or NYSHRL (*Pezhman v City of New York*, 47 AD3d 493, 494 [1st Dept. 2008] [citing *Forrest*, 3 NY3d at 313]).

Plaintiff argues that he mentioned in the Ethics & Compliance complaint that he is "not sure if [he is] being discriminated against for having a child that I need to take care of during the

150640/2021  POGIL, BORIS vs. KPMG, LLP
Motion No. 005

Page 26 of 27

26 of 27

pandemic" (Opp. at 23). Even if this single remark rose to the level of a protected activity, plaintiff cannot prove a causal connection between the investigation and his inclusion in the RIF. Defendants argue that the low performer rating occurred before he made the complaint, and the low performer designation is what caused him to be terminated in the RIF. He cannot otherwise prove that it was the complaint that caused him to be included in the RIF and not the LPM (*see* Memo at 23-24). The fact that the RIF occurred after plaintiff had already filed his Ethics & Compliance investigation alone "does not create an issue of fact as to causality" (*Forrest*, 3 NY3d at 313). Because plaintiff cannot point to any other evidence to raise an issue of fact as to causation, he did not sufficiently make out a claim for retaliation under the NYSHRL or even the more lenient NYCHRL. Therefore, defendants are awarded summary judgment on plaintiff's retaliation claims.

Accordingly, it is hereby

ORDERED that defendants' motion is granted and plaintiff's complaint is dismissed as against all defendants.

The clerk shall enter judgment accordingly.

| 01/29/2024 | | | | | |
|---|---|---|---|---|---|
| DATE | | | SHLOMO S. HAGLER, J.S.C. | | |

| CHECK ONE: | X | CASE DISPOSED | | NON-FINAL DISPOSITION | |
| | X | GRANTED | ☐ DENIED | ☐ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ | SETTLE ORDER | | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ | INCLUDES TRANSFER/REASSIGN | | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

**150640/2021   POGIL, BORIS vs. KPMG, LLP**
**Motion No.  005**

Page 27 of 27